STATE OF CONNECTICUT *v.* RUFUS SPEARMAN
(AC 18194)

Spear, Zarella and Healey, Js.

Argued February 29—officially released June 27, 2000

*Norman A. Pattis,* for the appellant (defendant).

*Timothy J. Sugrue,* senior assistant state's attorney, with whom, on the brief, were *Michael Dearington,* state's attorney, and *Elpedio N. Vitale,* senior assistant state's attorney, for the appellee (state).

*Opinion*

ZARELLA, J. The defendant, Rufus Spearman, appeals from the judgment of conviction, rendered after a jury trial, of two counts of arson in the first degree in violation of General Statutes § 53a-111 (a) (2) and (4)[1] and one count of conspiracy to commit arson in the first degree in violation of General Statutes §§ 53a-48[2] and 53a-111 (a) (4). On appeal, the defendant claims that (1) the evidence at trial was insufficient to support his conviction of first degree arson or conspiracy to commit arson, (2) his right to confront the state's witness was denied in violation of the sixth amendment to the United States constitution and (3) the court abused its discretion in admitting consciousness of guilt evidence. We affirm the judgment of the trial court.

The jury reasonably could have found the following facts. On the morning of October 23, 1996, a fire occurred at a three family home located at 16 Clover Place in New Haven as a result of arson. Earlier that morning, Katherine Hutchings was walking to a store and witnessed the defendant with Terrance Newton

---

[1] General Statutes § 53a-111 (a) provides in relevant part: "A person is guilty of arson in the first degree when, with intent to destroy or damage a building, as defined in section 53a-100, he starts a fire or causes an explosion, and . . . (2) any other person is injured, either directly or indirectly; or . . . (4) at the scene of such fire or explosion a peace officer or firefighter is subjected to a substantial risk of bodily injury."

[2] General Statutes § 53a-48 (a) provides: "A person is guilty of conspiracy when, with intent that conduct constituting a crime be performed, he agrees with one or more persons to engage in or cause the performance of such conduct, and any one of them commits an overt act in pursuance of such conspiracy."

walking toward the area located between 16 and 18 Clover Place. The two men were carrying a large object with a handle that resembled a bucket or jug. Hutchings called out to the defendant and Newton as they went toward the back of the houses to ask them why they were up so early. She continued walking when they did not respond.

While walking home from the store, Hutchings heard a "big boom," and when she turned the corner she saw that the house at 16 Clover Place was on fire. She also saw the defendant and Newton on Clover Place running toward Truman Street. Newton was wearing a coat that was on fire. Hutchings saw Newton drop the coat onto the ground as he ran.

Edith Hunter, who lived at 18 Clover Place, also heard a loud sound that she described as "a big boom." Hunter ran to her front porch and saw Newton stumbling and running from the porch of the house that was on fire wearing or carrying a smoldering coat. Although Hunter did not see the defendant running from the house, she did see the two men together that morning and she saw the defendant on Clover Place after the fire started, but before the fire department arrived.

At approximately 7:45 a.m., Napoleon Gunn, an off-duty firefighter, noticed smoke coming from 16 Clover Place. Gunn shouted to a passerby to call 911 as he attempted to enter the burning house. The New Haven fire department responded to the fire immediately. There was a tremendous volume of fire, which began to ignite the Hunter's home next door. Lieutenant James Robinson testified that the volume of the fire in such a short period of time indicated that it was the work of an arsonist.

Lieutenant Thomas Heinz and two firefighters went into the burning house equipped with bottled oxygen and air masks. Heinz testified that even through his

oxygen mask, he could detect a strong odor of gasoline in the house. The men made their way up to the third floor where a firefighter fell through the floor that had been weakened by the fire. He was trapped momentarily until the other firefighters eventually pulled him from the hole in the floor. The firefighters then were forced to retreat from the third floor. Heinz also testified that the use of an accelerant like gasoline increases the risk posed to firefighters because it accelerates the rate of burn, causes floors to weaken more quickly when poured onto them, and causes the flames to explode and flare when hit with water.

New Haven Fire Marshal Frank Dellamura also responded to the fire. He discovered four or five areas in 16 Clover Place where gasoline had been poured but did not ignite. Additionally, in three rooms on the first floor, Dellamura found six or seven plastic milk containers that were partially melted with scorch marks near each of them. Dellamura opined that the fire was the result of an arsonist who had attempted to cause an explosion and to burn the house down. Dellamura also opined that because the fire originated in several areas, it must have been set by more than one person.

The defendant was charged by information with arson in the first degree and conspiracy to commit arson in the first degree. The defendant and Newton were tried together. The defendant moved for a judgment of acquittal at the end of the state's case. The motion was denied, and the defendant was subsequently convicted. This appeal followed.

I

The defendant first claims that the evidence is insufficient to sustain his conviction of arson in the first degree and conspiracy to commit arson in the first degree. We are unpersuaded and conclude that the evidence is sufficient to support his conviction of both crimes.

"The standard of review employed in a sufficiency of the evidence claim is well settled. [W]e apply a two-part test. First, we construe the evidence in the light most favorable to sustaining the verdict. Second, we determine whether upon the facts so construed and the inferences reasonably drawn therefrom the [jury] reasonably could have concluded that the cumulative force of the evidence established guilt beyond a reasonable doubt. . . . In this process of review, it does not diminish the probative force of the evidence that it consists, in whole or in part, of evidence that is circumstantial rather than direct. . . . It is not one fact, but the cumulative impact of a multitude of facts which establishes guilt in a case involving substantial circumstantial evidence. . . . .

"While the jury must find every element proven beyond a reasonable doubt in order to find the defendant guilty of the charged offense, each of the basic and inferred facts underlying those conclusions need not be proved beyond a reasonable doubt. . . . If it is reasonable and logical for the jury to conclude that a basic fact or an inferred fact is true, the jury is permitted to consider the fact proven and may consider it in combination with other proven facts in determining whether the cumulative effect of all the evidence proves the defendant guilty of all the elements of the crime charged beyond a reasonable doubt. . . . Moreover, [i]n evaluating evidence that could yield contrary inferences, the [jury] is not required to accept as dispositive those inferences that are consistent with the defendant's innocence. . . . As we have often noted, proof beyond a reasonable doubt does not mean proof beyond all possible doubt . . . nor does proof beyond a reasonable doubt require acceptance of every hypothesis of innocence posed by the defendant that, had it been found credible by the [jury], would have resulted in an acquittal. . . . On appeal, we do not ask whether there is a

reasonable view of the evidence that would support a reasonable hypothesis of innocence. We ask, instead, whether there is a reasonable view of the evidence that supports the jury's verdict of guilty." (Citations omitted; internal quotation marks omitted.) *State* v. *Torres*, 242 Conn. 485, 489–90, 698 A.2d 898 (1997).

## A

We first examine the claim that the evidence is insufficient to support the defendant's conviction of arson in the first degree.

Hutchings saw the defendant with Newton very early on the morning of October 23, 1996, carrying a bucket between the houses at 16 and 18 Clover Place. Soon after, Hutchings heard a "big boom," and when she approached 16 Clover Place, she saw the defendant and Newton running toward Truman Street. She also observed that Newton's coat was on fire. Hunter also identified Newton as the person she saw running from the porch at 16 Clover Place wearing or carrying a smoldering coat.

The fire marshall testified that the evidence at the fire scene demonstrated that more than one person was involved in setting the fire. There was also sufficient testimony that a firefighter fell through the weakened flooring while fighting the fire and that the firefighters were subjected to a substantial risk of bodily harm. The jury reasonably could have found, on the basis of the evidence presented and the reasonable inferences drawn therefrom, that the state had met its burden of proving beyond a reasonable doubt each of the elements of the crime of arson in the first degree.

## B

The defendant also attacks the sufficiency of the evidence with respect to his conviction of the crime of conspiracy to commit arson in the first degree. We are

again persuaded that the evidence is legally sufficient to support the verdict of the jury.

To establish the crime of conspiracy in violation of § 53a-48, the state must prove beyond a reasonable doubt that two or more individuals agreed to act in concert to commit an illegal act and that any one of the participants committed an overt act in furtherance of the conspiracy. *State* v. *Haggood*, 36 Conn. App. 753, 764, 653 A.2d 216, cert. denied, 233 Conn. 904, 657 A.2d 644 (1995). "The state is also obligated to prove that the accused intended that conduct constituting a crime be performed." Id.

"The gravamen of the crime of conspiracy is the unlawful combination and an act done in pursuance thereof, not the accomplishment of the objective of the conspiracy. . . . Conspiracy is an inchoate offense the essence of which is an agreement to commit an unlawful act. . . . The prohibition of conspiracy is directed not at the unlawful object, but at the process of agreeing to pursue that object. . . . Conspiracy is an anticipatorial offense distinguished by a corrupt agreement by two or more persons to commit a specific objective crime." (Citation omitted; internal quotation marks omitted.) *State* v. *Hooks*, 30 Conn. App. 232, 242, 619 A.2d 1151, cert. denied, 225 Conn. 915, 623 A.2d 1025 (1993); see also *State* v. *Rouleau*, 204 Conn. 240, 258, 528 A.2d 343 (1987); *State* v. *Beccia*, 199 Conn. 1, 3, 505 A.2d 683 (1986).

The state is not obligated to prove the existence of a formal agreement among the conspirators; *State* v. *Lewis*, 220 Conn. 602, 607, 600 A.2d 1330 (1991); but must prove that the conspirators knowingly engaged in a mutual plan to commit a forbidden act. *State* v. *Wideman*, 36 Conn. App. 190, 200, 650 A.2d 571 (1994), cert. denied, 232 Conn. 903, 653 A.2d 192 (1995). As a consequence, circumstantial evidence may be used to

provide the proof necessary to establish the existence of the agreement "because conspiracies, by their very nature, are formed in secret and only rarely can be proved by other than circumstantial evidence." *State* v. *Sweeney*, 30 Conn. App. 550, 559, 621 A.2d 304, cert. denied, 225 Conn. 927, 625 A.2d 827 (1993); see also *State* v. *Wideman*, supra, 201.

Viewing the evidence in the light most favorable to sustaining the verdict, we conclude that the evidence presented to the jury was sufficient to have permitted it to find the defendant guilty of the crime of conspiracy. Because we already have determined that the jury had before it evidence sufficient to support its determination that the defendant was guilty of the underlying crime, the overt act requirement has been satisfied.

Next, we consider whether there was sufficient evidence of an agreement between two or more persons to act in concert. The testimony of Hutchings that she saw Newton and the defendant carrying a bucket together between the two houses early in the morning supports the inference that they had agreed to act in concert. This is further strengthened by the testimony of the fire inspector that two people had ignited the building on different floors, and Hutchings' testimony that she saw both men fleeing the scene. Hutchings' testimony was corroborated in part by the testimony of Hunter who also saw Newton flee the building with a burning coat. The reasonable inferences that the jury could draw from the evidence presented at trial were sufficient to support the verdict on the conspiracy charge.

## II

The defendant also claims that he was denied his sixth amendment[3] right to confront the only witness

---

[3] The right of confrontation guaranteed by the sixth amendment to the United States constitution provides in relevant part: "In all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him . . . ."

that was able to place him at the scene of the fire. We disagree.

The following additional facts are necessary for the resolution of this issue. Prior to the commencement of trial, the state filed a motion in limine seeking to restrict the defendant and Newton from cross-examining Hutchings. Specifically, the state requested that the defendant and Newton be prohibited from eliciting any testimony suggesting that Hutchings is a police informant. The defendant's trial counsel timely objected to the state's motion, raising the claim that, if the state's motion was granted, the defendant's sixth amendment right would be violated.

At trial, out of the presence of the jury, the court first permitted Newton's attorney to voir dire the witness with respect to this issue. Trial counsel for the defendant was then permitted to conduct voir dire. During the course of voir dire, the court permitted defense counsel to inquire extensively into the relationship that Hutchings had with the police. This inquiry included questions with respect to payments made to Hutchings by the police over the course of years.

After voir dire was completed, the state's attorney set forth, on the record, his objections, and the court ruled in part that "the fact that she did give information to the police in three other arson matters, that you may inquire into; and that her, apparently her niece said something about the niece's father, that is hearsay, and that is out; and that she did use crack cocaine years ago, that is out; and whether she has been involved in robberies, her answer was no, and that ends that, so that is out; and the police looking the other way, you have to ask the police that question, not her, so that is out."

The defendant claims that the court improperly refused to permit his counsel to inquire as to what the

payments made to Hutchings by the state were for and as to what was expected of Hutchings by the police in exchange for the payments. We have examined the transcript in detail, including both the voir dire of Hutchings as well as testimony before the jury, and we conclude that no ruling by the court in any way restricted defense counsel from such an inquiry. In fact, the contrary is true. Defense counsel elicited, before the jury, the fact that Hutchings received payments from the police on numerous occasions. Defense counsel further elicited from Hutchings the fact that she acted as an informant for the police on numerous occasions. The transcript does not support the defendant's contention that the court restricted cross-examination into this area of inquiry.

The defendant argues that the court took over the voir dire of the witness and inquired into this subject matter, and that this questioning by the court failed to probe deeply enough and left the ultimate question of why the police were paying the witness unanswered.[4]

---

[4] The following colloquy occurred during the voir dire of Hutchings:

"[Defense Counsel]: You work as an informant for the police in cases where you haven't testified, you haven't testified in court, you have been paid money?

"Katherine Hutchings: To do what?

"Q. Provide the police with information?

"A. No, not to tell them. If I tell them something, it's not, I don't get paid for telling them something, it's if I go do something, then I get paid for that. See, it's two different things.

"Q. What do you get paid for?

"A. That's irrelevant. I'm not going to answer that. That doesn't have nothing to do with arson.

"[Defense Counsel]: Well, I would claim that, Your Honor.

"[Assistant State's Attorney]: Your Honor, this is the problem. I don't think there has been a showing that would necessitate the witness talking about the specific work that she has done for the police in the past.

"The Court: The question is whether or not she receives money to give information to the police.

"[Assistant State's Attorney]: And I think her testimony was she does not.

"Katherine Hutchings: No, I do not.

"[Defense Counsel]: But, you know, Your Honor, there is an interrelationship between what her—concerning her relationship with the police, I think

By the court inquiring as it did, defense counsel could readily determine that the area of inquiry was not con-

that we need to know, and this jury needs to know the essence of it, what the relationship, nature of the relationship is.

"The Court: Counsel, the question was asked did she receive money in exchange for giving the police information. Her answer is no.

"[Defense Counsel]: No, she testified money for other things, and I think we—

"The Court: Well, that question hadn't been posed yet.

"[Defense Counsel]: Well—Mrs. Hutchings, you—what did you get paid— withdraw the question. You have been paid by the police department, isn't that correct?

"Katherine Hutchings: Okay.

"[Defense Counsel]: What type of work do you get paid to do?

"[Assistant State's Attorney]: I object to that.

"[Defense Counsel]: Your Honor, I'm not asking for specific details, or to her to name any defendants or people that she may provide information about. I'm just asking what type of—what type of activities does she get paid for.

"[Assistant State's Attorney]: Except the type of activity, once it is named, is going to be pretty apparent, what it entails, and who is involved, and I see nothing to do with these defendants, Your Honor.

"The Court: Well, there may well be some relevancy that she is receiving money from the police department.

"[Assistant State's Attorney]: I don't quarrel with that. My problem is to get into what exactly she has done in the past, naming specifically what it's been, I don't think is—what does that—what is that probative of, nature of what she has done in the past?

"[Defense Counsel]: What she expects to get out of her testimony or any other information she has provided to the police.

"The Court: Well, that question you can ask.

"[Defense Counsel]: Well, Your Honor, I'm asking her what she has been paid for in the past, which may be a motive for her having come forward to the police or providing information to the police.

"Katherine Hutchings: Doesn't have anything to do with this, nothing to do with this. I have not received no money for this right here, or know— even know if they plan on giving me any for this right here.

"[Defense Counsel]: I think that is for the judge to decide, Your Honor, not the witness to decide.

"Katherine Hutchings: Well—

"The Court: No, it's partially responsive. But ma'am, the police have paid you money?

"Katherine Hutchings: In the past, yes.

"The Court: Yes. And when was the last time, approximately?

"Katherine Hutchings: Maybe—I haven't done anything for them like that in about [a] year or more.

sidered inappropriate by the court. If defense counsel felt that it was beneficial to inquire further, he could have done so. He did not. Nor did he assert at any time that the defendant's right to confrontation was being abridged in any way. We, accordingly, conclude that the defendant's sixth amendment rights were not violated.

## III

The defendant's final claim is that the court abused its discretion in permitting consciousness of guilt evidence to be admitted when such evidence was based on the conduct of a person other than the defendant. We decline to address this claim.

"The Court: Okay.

"Katherine Hutchings: I haven't worked with them or nothing.

"The Court: Counsel, there should be some information regarding not the cases but, well, you have indicated you do not, you have not received money from the police in exchange for giving them information?

"Katherine Hutchings: No.

"The Court: Is that correct?

"Katherine Hutchings: Uh-huh. Yes.

"The Court: Okay.

"[Counsel for Newton]: On this case we're talking about now?

"The Court: No, no. Generally?

"Katherine Hutchings: In general on all cases?

"The Court: But at times, the police have paid you money?

"Katherine Hutchings: Yes.

"The Court: Okay. Have you received that money that the police have paid you, was that for you to testify?

"Katherine Hutchings: No, at no time.

"The Court: Was it for you to give signed statements?

"Katherine Hutchings: No.

"The Court: It was not to give information?

"Katherine Hutchings: No.

"The Court: Well, generally, what was it for, without naming names of people, was it to pay your rent?

"Katherine Hutchings: No, no. It was for me to purchase things.

"The Court: Oh. All right. To purchase things. Okay. All right.

"[Defense Counsel]: Have you received other compensation from the police?

"Katherine Hutchings: Besides money?

"[Defense Counsel]: Have you ever received drugs from the police?

"Katherine Hutchings: No."

On November 20, 1997, Hutchings testified out of the presence of the jury that on November 18, 1997, a white car pulled up in front of her house. Hutchings testified that this occurred sometime in the afternoon. She further testified that she saw the defendant in the back seat. Hutchings was scared and contacted a police officer whom she knew. She also testified that she was reluctant to testify because of the incident. Further, Hutchings testified that the car returned later that evening. The man driving the car yelled to Hutchings to mind her own business.

The defendant objected to Hutchings' testimony as hearsay and also claimed that "she never claims that she seen [sic] Mr. Spearman."[5] Subsequently, Hutchings clarified that she did see the defendant in the car when the car first appeared in front of her house. The defendant did not offer any additional objections after this issue was resolved.

The defendant, therefore, failed to object to the consciousness of guilt evidence during the trial and now seeks to argue on appeal that its admission was improper. "Ordinarily, we will not review a claim that was not distinctly raised before the trial court." (Internal quotation marks omitted.) *State* v. *Perez*, 57 Conn. App. 385, 389, 748 A.2d 384 (2000). In addition, the defendant has failed to raise a claim of entitlement to the extraordinary review provided under *State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989).[6]

[5] On cross-examination by the defendant, Hutchings testified that the first incident occurred at 2:30 in the afternoon. The defendant objected to her testimony because court was in session that day and Hutchings was then asked whether she was certain about the time. Hutchings explained that she was certain only that it was sometime in the afternoon. When the court clerk confirmed that court had adjourned at 3:30 p.m. on November 18, the defendant withdrew his objection "as to Tuesday afternoon."

[6] *Golding* held that "a defendant can prevail on a claim of constitutional error not preserved at trial only if *all* of the following conditions are met: (1) the record is adequate to review the alleged claim of error; (2) the claim

"In the absence of such a request, we have, in the past, declined to review a defendant's claim under similar circumstances." (Internal quotation marks omitted.) *State* v. *Perez*, supra, 389.

Practice Book § 60-5 provides in relevant part that "[t]he court shall not be bound to consider a claim unless it was distinctly raised at the trial or arose subsequent to trial. The court may in the interests of justice notice plain error not brought to the attention of the trial court. . . ." Moreover, we have held that "[w]here a trial court's action does not result in any manifest injustice, a defendant's claim under the plain error doctrine does not warrant review. . . . Such review is reserved for truly extraordinary situations where the existence of the error is so obvious that it affects the fairness and integrity of and public confidence in the judicial proceedings." (Internal quotation marks omitted.) *State* v. *Domian*, 235 Conn. 679, 692, 668 A.2d 1333 (1996). The defendant has not sought review of the court's judgment on the basis of plain error, and we do not perceive any such basis. We therefore decline to review the defendant's claim.

The judgment is affirmed.

In this opinion the other judges concurred.

---

is of constitutional magnitude alleging the violation of a fundamental right; (3) the alleged constitutional violation clearly exists and clearly deprived the defendant of a fair trial; and (4) if subject to harmless error analysis, the state has failed to demonstrate harmlessness of the alleged constitutional violation beyond a reasonable doubt." (Emphasis in original.) *State* v. *Golding*, supra, 213 Conn. 239–40.