******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion. In no event will any such motions be accepted before the "officially released" date.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the electronic version of an opinion and the print version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest print version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears on the Commission on Official Legal Publications Electronic Bulletin Board Service and in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

RUFUS SPEARMAN *v.* COMMISSIONER
OF CORRECTION
(AC 35974)

Alvord, Sheldon and Bear, Js.

*Argued September 24, 2015—officially released April 19, 2016*

(Appeal from Superior Court, judicial district of
Tolland, T. Santos, J.)

*James B. Streeto*, senior assistant public defender, for the appellant (petitioner).

*Denise B. Smoker*, senior assistant state's attorney, with whom, on the brief, were *Michael Dearington*, state's attorney, and *David Clifton*, deputy assistant state's attorney, for the appellee (respondent).

*Opinion*

BEAR, J. The petitioner, Rufus Spearman, appeals from the judgment of the habeas court denying his petition for a writ of habeas corpus. On appeal, the petitioner claims that the habeas court erred (1) in not finding that his trial counsel provided ineffective assistance, as set forth in count three of his petition, by failing to call several available alibi witnesses during the petitioner's criminal trial and (2) by sustaining certain evidentiary objections by the respondent, the Commissioner of Correction (commissioner), which led to the court's granting of the commissioner's motion to dismiss counts one and two of the petition for failure to make out a prima facie case. We disagree and, accordingly, affirm the judgment of the habeas court.

As recited by this court on direct appeal, the facts which the jury reasonably could have found concerning the petitioner's underlying conviction are as follows: "On the morning of October 23, 1996, a fire occurred at a three family home located at 16 Clover Place in New Haven as a result of arson. Earlier that morning, Katherine Hutchings was walking to a store and witnessed the [petitioner] with Terrance Newton walking toward the area located between 16 and 18 Clover Place. The two men were carrying a large object with a handle that resembled a bucket or jug. Hutchings called out to the [petitioner] and Newton as they went toward the back of the houses to ask them why they were up so early. She continued walking when they did not respond.

"While walking home from the store, Hutchings heard a 'big boom,' and when she turned the corner she saw that the house at 16 Clover Place was on fire. She also saw the [petitioner] and Newton on Clover Place running toward Truman Street. Newton was wearing a coat that was on fire. Hutchings saw Newton drop the coat onto the ground as he ran.

"Edith Hunter, who lived at 18 Clover Place, also heard a loud sound that she described as 'a big boom.' Hunter ran to her front porch and saw Newton stumbling and running from the porch of the house that was on fire wearing or carrying a smoldering coat. Although Hunter did not see the [petitioner] running from the house . . . [1] she saw the [petitioner] on Clover Place after the fire started, but before the fire department arrived.

"At approximately 7:45 a.m., Napoleon Gunn, an off-duty firefighter, noticed smoke coming from 16 Clover Place. Gunn shouted to a passerby to call 911 as he attempted to enter the burning house. The New Haven fire department responded to the fire immediately. There was a tremendous volume of fire, which began to ignite . . . Hunter's home next door. Lieutenant James Robinson testified that the volume of the fire in such

a short period of time indicated that it was the work of an arsonist.

"Lieutenant Thomas Heinz and two firefighters went into the burning house equipped with bottled oxygen and air masks. Heinz testified that even through his oxygen mask, he could detect a strong odor of gasoline in the house. The men made their way up to the third floor where a firefighter fell through the floor that had been weakened by the fire. He was trapped momentarily until the other firefighters eventually pulled him from the hole in the floor. The firefighters then were forced to retreat from the third floor. Heinz also testified that the use of an accelerant like gasoline increases the risk posed to firefighters because it accelerates the rate of burn, causes floors to weaken more quickly when poured onto them, and causes the flames to explode and flare when hit with water.

"New Haven Fire Marshal Frank Dellamura also responded to the fire. He discovered four or five areas in 16 Clover Place where gasoline had been poured but did not ignite. Additionally, in three rooms on the first floor, Dellamura found six or seven plastic milk containers that were partially melted with scorch marks near each of them. Dellamura opined that the fire was the result of an arsonist who had attempted to cause an explosion and to burn the house down. Dellamura also opined that because the fire originated in several areas, it must have been set by more than one person.

"The [petitioner] was charged by information with arson in the first degree and conspiracy to commit arson in the first degree. The [petitioner] and Newton were tried together. The [petitioner] moved for a judgment of acquittal at the end of the state's case. The motion was denied, and the [petitioner] was subsequently convicted." (Footnote added.) *State* v. *Spearman*, 58 Conn. App. 467, 468–70, 754 A.2d 802 (2000). On appeal, this court affirmed the judgment of conviction. Id., 480.

In his amended three count petition for a writ of habeas corpus filed July 19, 2010,[2] the petitioner claimed in count one that the state had violated his constitutional right to due process by failing to disclose evidence concerning the relationship of the state's witness, Hutchings, to the police. In count two, the petitioner claimed in the alternative that his trial counsel, Michael Dolan, had rendered ineffective assistance by failing to obtain that information concerning Hutchings' relationship with the police that could have been used to impeach her credibility. In count three, the petitioner asserted that Dolan had rendered ineffective assistance by failing to present a viable alibi defense.

The petitioner's habeas trial began on October 1, 2010, at which time the habeas court, *T. Santos, J.*, heard the testimony of Dolan, the petitioner's uncles, Jashon Spearman (Jashon), and Stacey Spearman (Sta-

cey), and the petitioner's cousin, Shane Hawkins. The trial was continued several times, with the testimony of the petitioner being heard on June 22, 2012, and it concluded with the testimony of the petitioner's cousin, Yvalesse[3] Nelson (Yvalesse), formerly Yvalesse Spearman, on July 10, 2012. Numerous exhibits were received into evidence, including transcripts from the petitioner's criminal trial, reports completed by the officials who had investigated the fire, and photographs of the front and side of the residential building known as 11 and 15 Clover Place.

Following the presentation of the petitioner's case, the commissioner made an oral motion to dismiss counts one and two pursuant to Practice Book § 15-8, which the court granted. With respect to the third count alleging ineffective assistance of counsel for Dolan's failure to present an alibi defense, the court, in its memorandum of decision filed June 4, 2013, held that the petitioner had failed to satisfy either prong of the *Strickland*[4] test, and thus denied the habeas petition. The petitioner then filed a petition for certification to appeal from the court's judgment, which the court granted. This appeal followed. Additional facts will be discussed as necessary.

I

The petitioner's first claim on appeal is that the habeas court erred in concluding that Dolan did not render ineffective assistance of counsel despite his failure to call several available alibi witnesses whom he believed to be credible.

We begin with the standard of review applicable to this claim. "The habeas court is afforded broad discretion in making its factual findings, and those findings will not be disturbed unless they are clearly erroneous. . . . Historical facts constitute a recital of external events and the credibility of their narrators. . . . Accordingly, [t]he habeas judge, as the trier of facts, is the sole arbiter of the credibility of witnesses and the weight to be given to their testimony. . . . The application of the habeas court's factual findings to the pertinent legal standard, however, presents a mixed question of law and fact, which is subject to plenary review." (Citations omitted; internal quotation marks omitted.) *Gaines* v. *Commissioner of Correction*, 306 Conn. 664, 677, 51 A.3d 948 (2012).

"A criminal defendant is constitutionally entitled to adequate and effective assistance of counsel at all critical stages of criminal proceedings. . . . This right arises under the sixth and fourteenth amendments to the United States constitution and article first, § 8, of the Connecticut constitution. . . . As enunciated in *Strickland* v. *Washington*, [466 U.S. 668, 686, 687, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984)], [our Supreme Court] has stated: It is axiomatic that the right to counsel is

the right to the effective assistance of counsel. . . . A claim of ineffective assistance of counsel consists of two components: a performance prong and a prejudice prong. . . . The claim will succeed only if both prongs are satisfied." (Citations omitted; internal quotation marks omitted.) *Bryant* v. *Commissioner of Correction*, 290 Conn. 502, 510, 964 A.2d 1186, cert. denied sub nom. *Murphy* v. *Bryant*, 558 U.S. 938, 130 S. Ct. 259, 175 L. Ed. 2d 242 (2009).

A

To prove his or her entitlement to relief pursuant to *Strickland*, a petitioner must first satisfy what the courts refer to as the performance prong; this requires that the petitioner demonstrate that his or her counsel's assistance was, in fact, ineffective in that counsel's performance was deficient. "To establish that there was deficient performance by petitioner's counsel, the petitioner must show that counsel's representation fell below an objective standard of reasonableness. . . . A reviewing court must view counsel's conduct with a strong presumption that it falls within the wide range of reasonable professional assistance. . . . The range of competence demanded is reasonably competent, or within the range of competence displayed by lawyers with ordinary training and skill in the criminal law." (Citation omitted; internal quotation marks omitted.) *Llera* v. *Commissioner of Correction*, 156 Conn. App. 421, 428–29, 114 A.3d 178, cert. denied, 317 Conn. 907, 114 A.3d 1222 (2015).

"[J]udicial scrutiny of counsel's performance must be highly deferential. It is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable. . . . A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time. Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the [petitioner] must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." (Internal quotation marks omitted.) *Mukhtaar* v. *Commissioner of Correction*, 158 Conn. App. 431, 449, 119 A.3d 607 (2015). In reconstructing the circumstances, "a reviewing court is required not simply to give [the trial attorney] the benefit of the doubt . . . but to affirmatively entertain the range of possible reasons . . . counsel may have had for proceeding as [he] did . . . ." (Internal quotation marks omitted.) *Michael T.* v. *Com-*

*missioner of Correction*, 319 Conn. 623, 632, 126 A.3d 558 (2015), quoting *Cullen* v. *Pinholster*, 563 U.S. 170, 196, 131 S. Ct. 1388, 179 L. Ed. 2d 557 (2011).[5]

In the present case, the petitioner argues that the habeas court erred in determining that Dolan's failure to call available and known alibi witnesses did not constitute deficient performance. Examining the substance of the proffered witnesses' alibi testimony, the petitioner contends that their accounts render the testimony of the primary state's witness, Hutchings, extraordinarily implausible or impossible. The commissioner counters that the habeas court's determination was legally correct because none of the proffered alibi witnesses were entirely neutral or disinterested, their accounts were contradictory in some respects, and their testimony left open the possibility that the petitioner had set the fire and run across the street to his home before the alibi witnesses first saw him in the home. The commissioner argues that because the habeas court's factual findings are not clearly erroneous, this court must uphold the habeas court's determination that Dolan's decision was not unreasonable. After our thorough review of the record, we disagree with the petitioner that the habeas court erred in finding that Dolan lacked a strategic basis sufficient to justify his failure to present any alibi testimony and, therefore, we conclude that counsel's performance was not deficient.

We begin by noting that our review of an attorney's performance is especially deferential when his or her decisions are the result of relevant strategic analysis. E.g., *Michael T.* v. *Commissioner of Correction*, supra, 319 Conn. 632–33. Thus, "[a]s a general rule, a habeas petitioner will be able to demonstrate that trial counsel's decisions were objectively unreasonable only if there [was] no . . . tactical justification for the course taken." (Internal quotation marks omitted.) *Mozell* v. *Commissioner of Correction*, 291 Conn. 62, 79, 967 A.2d 41 (2009), citing, inter alia, *Eze* v. *Senkowski*, 321 F.3d 110, 129 (2d Cir. 2003) ("the decision not to call a witness must be grounded in some strategy that advances the client's interests").

"[T]he presentation of testimonial evidence is a matter of trial strategy." (Internal quotation marks omitted.) *Jackson* v. *Commissioner of Correction*, 149 Conn. App. 681, 701, 89 A.3d 426, cert. granted on other grounds, 313 Conn. 901, 96 A.3d 558 (2014). "Defense counsel will be deemed ineffective only when it is shown that a defendant has informed his attorney of the existence of the witness and that the attorney . . . without adequate explanation . . . failed to call the witness at trial. . . . Furthermore, [t]he failure of defense counsel to call a potential defense witness does not constitute ineffective assistance unless there is some showing that the testimony would have been helpful in establishing the asserted defense." (Citation omit-

ted; internal quotation marks omitted.) *Gaines* v. *Commissioner of Correction*, supra, 306 Conn. 681.

"[O]ur habeas corpus jurisprudence reveals several scenarios in which courts will not second-guess defense counsel's decision not to investigate or call certain witnesses or to investigate potential defenses, such as when . . . counsel learns of the substance of the witness' testimony and determines that calling that witness is unnecessary or potentially harmful to the case . . . ." Id., 681–82. Thus, an attorney's choice to pursue a defense that focuses on casting doubt on the state's case rather than on calling his or her own witnesses can be a reasonable choice. See, e.g., *Coward* v. *Commissioner of Correction*, 143 Conn. App. 789, 801, 70 A.3d 1152, cert. denied, 310 Conn. 905, 75 A.3d 32 (2013); *Stephen S.* v. *Commissioner of Correction*, 134 Conn. App. 801, 818–21, 40 A.3d 796, cert. denied, 304 Conn. 932, 43 A.3d 660 (2012); see also *Harrington* v. *Richter*, 562 U.S. 86, 109, 131 S. Ct. 770, 178 L. Ed. 2d 624 (2011) ("[t]o support a defense argument that the prosecution has not proved its case it sometimes is better to try to cast pervasive suspicion of doubt than to strive to prove a certainty that exonerates").

Further, we generally have upheld an attorney's choice to call certain witnesses instead of others. See *Morant* v. *Commissioner of Correction*, 117 Conn. App. 279, 304, 979 A.2d 507 (tactical decision not to call alibi witness where "she was not a strong witness and other alibi witnesses were available"), cert. denied, 294 Conn. 906, 982 A.2d 1080 (2009); *Hopkins* v. *Commissioner of Correction*, 95 Conn. App. 670, 675, 899 A.2d 632 (attorney "testified that he had thought [the alibi witness called] would present himself as . . . credible . . . and, therefore, he did not consider using either of the two women to bolster [alibi witness'] testimony or the alibi defense"), cert. denied, 279 Conn. 911, 902 A.2d 1071 (2006); *Faust* v. *Commissioner of Correction*, 85 Conn. App. 719, 722, 858 A.2d 853 (attorney "made the strategic decision not to have certain inmates, who were convicted felons, testify because, in his professional opinion, both the petitioner and one of the correctional officers were 'powerful' witnesses"), cert. denied, 272 Conn. 909, 863 A.2d 701 (2004).

We recognize, however, that there have been instances when our Supreme Court and this court have held that an attorney's failure to call specific witnesses was deficient performance. For example, in *Bryant* v. *Commissioner of Correction*, supra, 290 Conn. 504–505, Bernale Bryant, an African-American man, had been convicted of murder for pulling the decedent out of a car and beating him to death. The testimony of four uncalled witnesses, however, would have supported a defense that a group of Hispanic men had shot the decedent. Id., 507–508. Our Supreme Court held that Bryant's attorney had rendered deficient performance

when he did not call these four disinterested witnesses whose testimony, taken as a whole, would have created a credible third party culpability defense that would have provided an alternative to the two questionable eyewitnesses as to "the most basic elements" of the state's case. Id., 519–20.

Additionally, in *Vazquez* v. *Commissioner of Correction*, 107 Conn. App. 181, 185–86, 944 A.2d 429 (2008), the habeas court determined that defense counsel's performance was deficient for failing to provide to the jury the credible testimony of Anderson Vazquez and his girlfriend[6] that Vazquez had been asleep in their apartment at the time the crime was committed. On the commissioner's appeal, we noted that no evidence demonstrated that defense counsel's choice was based on a reasonable exercise of professional judgment;[7] rather, Vazquez' testimony suggested that defense counsel failed to prepare the defense because he did not believe that the robbery victim would appear for trial. Id., 186. Consequently, we dismissed the commissioner's appeal. Id., 187.

In *Siano* v. *Warden*, 31 Conn. App. 94, 99–101, 623 A.2d 1035, cert. denied, 226 Conn. 910, 628 A.2d 984 (1993), James Siano's trial counsel, on cross-examination obtained admissions undermining the credibility of the state's primary witness, an alleged coconspirator of Siano. Siano's trial counsel also offered the testimony of Siano's mother and sister to support the defense that Siano's recent injuries made it unlikely that he could have committed the crime at issue as alleged by that coconspirator. Having failed to subpoena either the surgeon who treated Siano or his medical records, however, Siano's trial counsel was unable to offer either to provide medical evidence in support of this defense. Id., 99–102. Under these circumstances, armed with the testimony of both the surgeon and an attorney offering expert witness testimony concerning the objective unreasonableness of Siano's trial counsel's choice, the habeas court discounted Siano's trial counsel's proffered reasons for this failure and found that his performance was deficient. Id., 103–104.

Affirming the habeas court's determination that Siano's trial counsel had provided ineffective assistance, we stated: "After examining the testimony as to the extent of [Siano's] injuries, the habeas court could have logically concluded that the testimony would have provided [Siano's] claims with credibility, casting significant doubts on the state's case. In light of this, we agree with the habeas court's finding, supported by the evidence, that counsel's failure to call the surgeon was not a strategic or tactical decision. His alleged strategy left [Siano] without a key witness and a viable defense." Id., 104–105.

Finally, we turn to the legal principles governing our review of the proffered testimony of the petitioner's

alibi witnesses. Our Supreme Court has clarified that in Connecticut, the crux of the alibi defense is to create a reasonable doubt as to key elements of the state's case. "[A]lthough an alibi is sometimes spoken of as a defense, it operates, in this state, to entitle an accused to an acquittal when he has so far proved his alibi that upon all the evidence a reasonable doubt of his guilt has been raised. While the state is bound to prove beyond a reasonable doubt all the essential elements of the crime charged, including proof of the presence of the accused at the scene of the crime, where an alibi is asserted and relied upon as a defense, the accused is entitled to have the jury instructed that the evidence offered by him upon that subject is to be considered by them in connection with all the rest, in determining whether he was present, and that if a reasonable doubt upon that point exists, it is their duty to acquit." (Internal quotation marks omitted.) *State* v. *McKnight*, 191 Conn. 564, 584, 469 A.2d 397 (1983). Circumstantial evidence can be used to support, or disprove, an alibi defense. See *State* v. *Tutson*, 278 Conn. 715, 733, 736–37, 899 A.2d 598 (2006).

As other courts have noted, alibi testimony is frequently the best way to counter eyewitness testimony of a defendant's involvement in a crime. See *Griffin* v. *Warden*, 970 F.2d 1355, 1359 (4th Cir. 1992) ("[e]yewitness identification evidence . . . is precisely the sort of evidence that an alibi defense refutes best"); *State ex rel. Wearry* v. *Cain*, 161 So. 3d 620, 621–22 (La. 2015) (same); cf. *State* v. *Jefferson*, 67 Conn. App. 249, 264, 786 A.2d 1189 (2001) ("[w]hen a case [would be] narrowed to the [issue of] credibility of [witnesses] . . . in those circumstances there [is] greater, not less, compelling reason for exploring all avenues which would shed light on which of the . . . witnesses [is] to be believed" [internal quotation marks omitted]), cert. denied, 259 Conn. 918, 791 A.2d 566 (2002). Consequently, absent a sufficient tactical reason, the failure to call an alibi witness can constitute deficient performance. See *Vazquez* v. *Commissioner of Correction*, supra, 107 Conn. App. 187; see also, e.g., *Mosley* v. *Atchison*, 689 F.3d 838, 849 (7th Cir. 2012) (failure to investigate and call alibi witnesses who would place petitioner across street at time fire started amounted to deficient performance); *Pena-Martinez* v. *Duncan*, 112 Fed. Appx. 113, 114 (2d Cir. 2004) ("[a]lthough a decision not to call particular witnesses is typically a question of trial strategy, an unexplained failure to call credible alibi witnesses cannot be considered reasonable trial strategy"); *Lopez* v. *Miller*, 915 F. Supp. 2d 373, 428–30 (E.D.N.Y. 2013) (counsel's performance deficient where failure to call alibi witnesses based solely on concerns about perception of bias, proximity to crime, and vagueness of time). Where the proffered witnesses would fail to account sufficiently for a defendant's location during the time or period in question,

however, a failure to present certain alibi witnesses has been upheld as reasonable under the circumstances. See *Jackson* v. *Commissioner of Correction*, supra, 149 Conn. App. 701 (attorney performance not deficient when alibi testimony could not account for petitioner's whereabouts for one hour period "immediately before, during, and after the robbery").

The habeas court summarized the proffered alibi and other witnesses' testimony as follows: "Attorney Dolan testified in the present matter that the petitioner told him that he did not commit the crimes he was charged with and that he was asleep across the street from where the fire occurred. Attorney Dolan utilized a private investigator, Daniel Blackman, a retired New Haven police officer, who interviewed eyewitnesses and potential alibi witnesses, took statements and prepared a report of his investigation.[8] The potential alibi witnesses were family members of the petitioner. Attorney Dolan testified that he met with some or all of these potential alibi witnesses and found them to be credible. The defense strategy eventually formulated by Attorney Dolan focused on showing that Ms. Hutchings, a frequent police informant whose statement to the police was the sole link connecting the petitioner to the arson, was concocting a story to gain good will with the police and obtain some financial benefit.[9] The trial strategy did not exclude calling alibi witnesses and, therefore, Attorney Dolan filed a notice of intention to offer an alibi defense that disclosed that the petitioner was at 11 Clover Place, the Spearman residence across the street from 16 Clover Place, where the arson occurred, at the time of the alleged offenses.[10]

"Attorney Dolan, as well as counsel for [the] codefendant, Newton, effectively utilized cross-examination to bring out and highlight inconsistencies between Ms. Hutchings' trial testimony and her written statement to the police. Attorney Dolan indicated that he did not call any of the petitioner's family members as witnesses because Ms. Hutchings had not testified well.[11] Instead of putting on separate versions of events (i.e., the state's versus the petitioner's), Attorney Dolan thought it more prudent to hold the state to its burden of proof and attack the credibility of the sole witness linking the petitioner to the offenses. Attorney Dolan also took into consideration the good cross-examination skills of the prosecuting attorney and that the petitioner's witnesses were family members who, although he found them credible and anticipated them placing the petitioner in their residence after the fire was underway across the street, could not provide an alibi for the time period in which the fire was set and started aside from the petitioner being asleep in his room. Thus, concern for family members' [possible] bias, the very close proximity of the petitioner's residence to the crime scene, and the inability of family members to provide a firm alibi led Attorney Dolan to conclude it was strategically bet-

ter to not open the door to cross-examination that highlighted the aforementioned concerns. Thus, according to Attorney Dolan, he made the decision after the state rested to not call the petitioner's family members as witnesses.[12]

"The first witness presented by the petitioner in support of his claimed alibi defense was Jashon Spearman . . . . Jashon Spearman testified that he was in the bathroom getting ready for work, heard an explosion, and about one minute later exited the bathroom and saw the petitioner coming out of his room. The petitioner looked as though he had just woken up and was wearing clothing that one would sleep in (e.g., shorts or long johns). According to Jashon Spearman, Yvalesse Nelson was downstairs and was calling for the petitioner to move the car. Jashon Spearman testified that he saw the petitioner run to get the car keys and then go outside to move the car, which he identified as belonging to his brother, Stacey Spearman. Jashon Spearman then went to the upstairs living room window, looked outside to view the fire and later went downstairs.

"Stacey Spearman . . . was the second family member to testify before this court in support of the petitioner's claimed alibi. Stacey Spearman testified that he was in the family room located in the basement when he heard his niece, Yvalesse Nelson, yelling. He then went upstairs, saw the fire across the street and heard Yvalesse Nelson tell the petitioner to move the car. According to Stacey Spearman, he saw the petitioner come downstairs after he himself had come up from the basement. On cross-examination, Stacey Spearman indicated that he did not go upstairs for several minutes, perhaps as [many] as seven minutes, before he went to the first floor to look out the window.

"The next potential alibi witness was Shane Hawkins . . . . Hawkins testified that he was in the basement when he heard Yvalesse Nelson scream and yell that there had been an explosion and for his uncle, Stacey Spearman, to move his car. Hawkins was aware that the petitioner had used Stacey Spearman's car the night before and, because Yvalesse Nelson did not know that the petitioner had used the car the previous night and still had the keys, darted upstairs to let the petitioner know to move the car. According to Hawkins, he went up to the first floor and to the outside door, which he said was unlocked, that led upstairs to the second floor. Hawkins went upstairs and saw the petitioner, who appeared sleepy, come out of his room, but did not see his uncle, Jashon Spearman. Hawkins told the petitioner that he needed to move the car. The petitioner found the keys and went downstairs, and Hawkins also went downstairs and opened the gates so that the petitioner could pull the car into the driveway.

"The petitioner testified next that he was asleep in his upstairs bedroom on the morning of the fire.

According to the petitioner, at approximately 8 a.m. he heard a noise, which he described as sounding like an explosion and thought it was his television set that he had left on all night, and which prompted him to reach for the remote and turn off the television set. The petitioner heard someone yelling his name and for him to move his grandmother's car,[13] which he had used the night before and thus still had the keys, and that was parked in front of the house. He then went to the window, which faced the front of the house, and saw flames coming from the house across the street. The petitioner further testified that he ran downstairs dressed in whatever he was wearing at the time he jumped out of bed,[14] got in the car and backed it up off the street into the driveway. He then stayed on the first floor, inside, and watched the fire and the firefighting efforts with other family members.[15] The petitioner also testified that he knew Newton's family and some of its members, but not Terrance Newton, and that he knew Katherine Hutchings from her hanging around the neighborhood. As to discussions with Attorney Dolan about presenting an alibi defense, the petitioner testified that he and counsel discussed presenting an alibi defense and calling alibi witnesses, both prior to trial and after the state rested. Attorney Dolan, according to the petitioner, informed him that he was not calling alibi witnesses because he thought the state's case was weak. Lastly, the petitioner acknowledged that he had a physical relationship with a woman who had lived in the house where the fire was set and that she had problems with her roommate, who had lived at the same location, had moved out, but returned periodically to retrieve her mail.

"The final witness presented by the petitioner was Yvalesse Nelson . . . . Ms. Nelson testified that at about 7 a.m. on the day of the offense, she was getting ready for work and looked out the window. Ms. Nelson then testified that she saw 'two males carrying a box, and they were walking down the street. They were coming from Truman Street, and they looked pretty suspicious. I mean, it was seven in the morning. They were two black males with dark clothing on. They approached the house across the street. I seen them because the house is vacant. And they went up to the second floor, and I seen them pouring something around with their hands; and then all of a sudden, there was, boom, an explosion. They started running out. They ran down Clover Place onto Truman Street; and when he was running, his coat got caught on the fence.' . . . Ms. Nelson indicated that she could not identify the two males and that neither was the petitioner. Ms. Nelson further testified that she went downstairs to let Stacey Spearman know that his car needed to be moved. She described a brief conversation about the car and the keys being in the petitioner's possession, which led her to go upstairs and bang on the outside door, which

she indicated was locked, that led to the upstairs to wake him up. The petitioner came downstairs appearing sleepy, went outside and moved the car into the gated driveway after Stacey Spearman opened the gates." (Citation omitted; emphasis omitted; footnotes altered.)

Following the trial on the amended petition in the present case, the habeas court did not make any explicit credibility determinations or engage in an evaluation of any potential or actual bias on the part of these alibi witnesses. Rather, it stated that, even assuming that the witnesses were credible and that there was no bias whatsoever, the petitioner had not demonstrated deficient performance because "the contradictions and inconsistencies between the various renditions of the events and activities vindicates Attorney Dolan's concerns about rigorous cross-examination by an experienced and effective prosecutor. Attorney Dolan's concerns about these inconsistencies contained within the petitioner's family members' rendition of events were well founded. Their versions of events would have done little, if anything, to undermine the state's case, as none of the petitioner's alibi witnesses can account for his whereabouts, aside from presumptively being asleep in bed, while the fire was being set, leaving open the opportunity for the petitioner to have helped set the fire, run across the street and go upstairs before the explosion and ensuing fire." Consequently, the court "agree[d] with Attorney Dolan's assessment that the focus of his defense efforts was better concentrated on attacking the credibility of Ms. Hutchings and showing her potential financial gain for cooperating yet again with the police. The petitioner has not shown that the testimony presented to this court would have been helpful in establishing an alibi defense sufficient to raise reasonable doubt in the jury's minds. In other words, this court concludes that Attorney Dolan's strategy and the decisions made in furtherance thereof were reasonable in light of all the circumstances."

Neither party contests that Dolan's decision was a matter of strategy made at trial, and we can adduce no basis in the record for a contrary determination. The issue presented, therefore, is whether this strategic decision was reasonable. To address this question, we must consider the choice under all the circumstances as they existed at the time that Dolan made the decision, evaluating that choice in light of the legal principles governing alibi defenses and with a strong presumption that the choice was reasonable. See *Bryant* v. *Commissioner of Correction*, supra, 290 Conn. 512–16.

To address the petitioner's claim, additional facts concerning his criminal trial are necessary. At trial, the state presented numerous witnesses who testified about the fire and likely arson at 16 Clover Place on October 16, 1996. Only two witnesses, however, claimed to see anyone going into or running away from 16 Clover

Place near the time of the fire. The first eyewitness, Hunter, testified that she had been making breakfast at approximately 7:45 a.m. in her first floor apartment at 18 Clover Place when she heard the explosion. Running from her kitchen to the living room and out onto the porch, she witnessed a man stumble off the porch and run past her house toward Truman Street. She yelled at him and was able to get a look at the man when he looked back; he eventually turned the corner and headed in the direction of the Truman School. She identified this man, both in a photographic array subsequent to the fire and at trial, as Newton. Although testifying that Yvalesse smiled or laughed in response to her questions soon after Hunter saw Newton run away, Hunter also stated that she did not see anyone else at 11 Clover Place when she saw Yvalesse. Further, she stated that she did not see the petitioner running off the porch or down the street with Newton, though she had been focusing on Newton, and could only affirmatively state that she saw the petitioner after the fire had started when he moved a car.

The second eyewitness was Hutchings. On direct examination, she testified that she needed certain items for her children and walked to a store soon after 7 a.m. Turning onto Clover Place from Truman Street, she noticed both Newton and the petitioner (whom she knew only as "Little Man")[16] carrying a big jug or bucket into the house. She crossed the street and saw the two of them enter the side of 16 Clover Place. After seeing the two men, Hutchings kept walking to the store; upon discovering her intended destination was closed, she went to another store, completed her errands, and headed back along the route from which she came.

Hutchings further testified that, on her return trip, she was on Washington Avenue and about two houses from the corner where Washington Avenue meets Clover Place when she heard an explosion. Turning the corner, she saw the petitioner and Newton about two and one-half houses from the corner where she was standing and running down the street toward Truman Street. She lost track of Newton when he turned onto Morris Street and headed in the direction of the Truman School, and the petitioner when he went between two brown houses on Clover Place. She then traveled down Clover Place to Truman Street, which she took to head home.

After taking her children to school, she passed by Clover Place roughly twenty minutes later, and although briefly interacting with the firefighters and police officers on the scene, she did not have a full conversation with them at that time. She also stated that she called on her neighbor, Carrie Crenshaw, and told her what she had seen. Finally, she testified, both outside of the jury's presence and once the jurors were recalled, as to two allegedly threatening encounters in which the

petitioner and people seemingly acting on his behalf had pulled up in front of her house and told her to mind her own business a few days before she began testifying. She also admitted that she previously had acted as an informant for a New Haven Police Department officer.

On cross-examination, inquiries were made by both Dolan and Newton's attorney, Lawrence Hopkins, as to several aspects of Hutchings' testimony.[17] Two particular aspects of the cross-examination of Hutchings merit further comment. First, in response to Dolan's questions about whether she had returned to 16 Clover Place within two weeks and seen a reward sign posted there, she responded that she had not. Second, Hutchings offered conflicting testimony concerning when and how she turned the corner from Washington Avenue onto Clover Place after hearing the explosion. During the state's direct examination and Dolan's cross-examination, her testimony suggested that she turned the corner almost immediately after the explosion and then paused there for a few minutes. In response to Hopkins' cross-examination, however, Hutchings testified that after hearing the explosion, she was stunned and waited three to four minutes before turning the corner onto Clover Place, where she stopped for another few minutes while watching the petitioner and Newton run away from the fire.

Subsequent to Hutchings' testimony, the state called several such witnesses, but no other witness offered testimony as to the petitioner's location before, during, or after the fire at 16 Clover Place had started. Four witnesses, however, testified as to the timing of certain statements by Hutchings and various aspects of the investigation into, and the arrest of, the petitioner. Detective John Bashta testified that, on the day of the fire, Hutchings told him that she saw what happened and could help out with the investigation. He testified that he spoke with her again a few days after the fire, at which point she informed him that Newton and someone named "Little Man" had been involved in the fire, and two weeks later, when she informed him that "Little Man" lived on Clover Place across the street from the fire. He eventually took her official statement, and she made a positive identification of the petitioner in a photographic array in December, 1996. He clarified that, when taking the statement, he had not asked certain questions concerning which store she originally had planned to go to on the morning of the fire and whether she actually had gone inside. He also testified that reward posters were posted within one day of the fire at 16 Clover Place.

Dellamura testified that he was with Bashta when the latter spoke with Hutchings a few days after the fire when she implicated both Newton and the petitioner in the arson. He also stated that at some point during the investigation, he drove down a street parallel to Clover

Place and observed that the petitioner's residence had a back door. Crenshaw testified that she was a neighbor and friend of Hutchings. Crenshaw affirmed that, on the date of the fire, Hutchings had stopped by her house that morning and stated that she had observed the parties responsible for the fire, that one of them had a can, and that she had called out their names, though Crenshaw did not know them.

Finally, Quincy Freeman, a patrol officer with the New Haven Police Department, testified that while on patrol, he saw the petitioner. Knowing about the arrest warrant charging the petitioner with arson, Officer Freeman approached the petitioner and asked for identification. The petitioner gave a fake name, after which Officer Freeman arrested him.

After the state rested, the court considered, and denied, motions for acquittal by both defendants. Dolan called one witness, Carl Baab, who testified as to certain incidents that had occurred at the nearby Truman School on the morning of the fire.[18]

With this context, we consider the petitioner's claims, examining the testimony of the habeas witnesses with the same assumption of credibility and lack of bias that the habeas court attributed to it. With respect to Yvalesse, we conclude that the record demonstrates that Dolan reasonably could have decided not to call her for a variety of reasons. Her testimony appears to be inconsistent with that of Hawkins and Stacey in several important respects. Stacey asserted that he first headed upstairs from the basement to the first floor of 15 Clover Place to see what was going on after hearing Yvalesse, his niece, yelling downstairs and that he went upstairs "to see what was going on." Yvalesse, on the other hand, recounted coming downstairs and having an exchange with Stacey about the car's location, and suggesting that they went upstairs together to move the car.

Similarly, Hawkins testified that, after hearing his cousin, Yvalesse, yelling down to Stacey about moving the car, he ran upstairs to the first floor from the basement of 15 Clover Place and out the front door, then headed upstairs to let the petitioner know that he had to move the car. Hawkins stated that he was able to get upstairs immediately because the door leading to 11 Clover Place was unlocked, as it usually was. After Hawkins told the petitioner that the car needed to be moved, the petitioner started looking for the keys as Hawkins went back downstairs to open the gate.[19] Yvalesse stated that the door remained locked until the petitioner came downstairs to move the car, and, although she mentioned that she was waking up her cousins, she did not mention seeing Hawkins during this period.

Further, if Yvalesse had testified at trial, she would

have been exposed to two additional types of impeachment not faced by the other alibi witnesses. First, Hunter—one of only two witnesses called at trial who testified that she saw the party or parties responsible for setting the fire—testified that she saw Yvalesse outside on the porch of 15 Clover Place soon after the explosion. She stated that she yelled to Yvalesse, asking if Yvalesse had seen what had just occurred and that Yvalesse had smiled or laughed in response. Yvalesse challenged these statements in her habeas testimony.

Second, a report prepared by the police during their investigation contains a statement attributed to an "Ydalesse Spearman," who is listed as residing at 11 Clover Place. Although the declarant recounts seeing two men running away immediately following the fire, there is no indication in the statement that she saw either of the two men prior to the explosion. Although Yvalesse testified that several aspects of the statement were inaccurate and that she did not recall making it, she also affirmed that she gave a statement to an "investigator" a few days after the fire, but could not recall the name of the investigator or whom he represented.

Finally, Yvalesse testified that she saw two people enter the building at about the same time that Hutchings arguably would have seen them. She also, both in her testimony and in her statement taken by the police on October 29, 1996, affirmed that she saw not one, but two people running away from 16 Clover Place toward Truman Street after the explosion. Given that Dolan's primary trial strategy was to discredit Hutchings' testimony, offering evidence *corroborating* a portion of Hutchings' account could have had the opposite effect. Thus, a review of the record reveals that it was not unreasonable for Dolan to decide that, on balance, Yvalesse's testimony would have hurt the petitioner.

Jashon testified at the habeas trial that he was awake and preparing for work on the morning of the explosion. As he exited his room a minute after hearing the explosion, he saw the petitioner exiting his bedroom, looking as if he had just awakened. Jashon further testified that he heard Yvalesse yelling to the petitioner two or three minutes after the explosion.

Hawkins testified that, hearing Yvalesse yelling downstairs about the fire, he ran upstairs to the first floor of 15 Clover Place, out of its front door, then to the front door of 11 Clover Place, and upstairs to the second floor apartment. Once inside the second floor apartment, Hawkins stated, he also saw the petitioner emerge from his bedroom, looking dressed for bed and as if he had just awoken. Hawkins testified that it took a minute or two from hearing Yvalesse yelling downstairs for him to reach the outside of the building.

Although Jashon's testimony on the morning of the

fire would appear to place the defendant in his room in 11 Clover Place just after the explosion, the timing of his observations was tied directly to the loud exclamations of Yvalesse, in that he heard her yelling for the defendant to move the car in the immediate aftermath of the explosion. Therefore, although his testimony, if believed, could have raised a reasonable doubt as to whether the petitioner started the fire, it could not have done so without eliciting the flawed testimony of Yvalesse, which Dolan reasonably might have sought to keep away from the jury. Similarly, although Hawkins' testimony, if believed, might have cast doubt on the state's version of the facts, he testified that he had not heard the explosion, but ran upstairs only after hearing Yvalesse yelling downstairs. Thus, the presentation of his testimony would have made it necessary to call Yvalesse, which Dolan might reasonably have sought to avoid doing.

After a thorough review of the record, including the testimony identified by the petitioner, and applying the relevant legal principles governing our review, we conclude that the habeas court did not err in determining that Dolan did not provide deficient representation by not calling the defendant's relatives as alibi witnesses. The habeas court, which assumed that these relatives were credible, found substantive inconsistencies in their testimony. These inconsistencies would have been subject to, and most likely highlighted on, cross-examination. See *State* v. *Briggs*, 179 Conn. 328, 333, 426 A.2d 298 (1979) ("[w]here a defendant proposes an alibi as his defense, one permissible method of determining whether the alibi was fabricated is to inquire into the specific details and the surrounding circumstances of the alibi on cross-examination in an attempt to show inconsistencies in the testimony of the various alibi witnesses, since the claim of alibi is subject to searching scrutiny"), cert. denied, 447 U.S. 912, 100 S. Ct. 3000, 64 L. Ed. 2d 862 (1980). Thus, although another fact finder, hearing and analyzing Dolan's testimony, might have made different findings, a habeas court is afforded broad discretion in making its factual findings, and the habeas court in this case was well within its authority to find that there were substantive testimonial inconsistencies and to accord them the weight that it did. See *Tuccio* v. *Zehrung*, 172 Conn. 350, 354, 374 A.2d 1044 (1977) ("the trier of fact is the judge of . . . the weight to be accorded to . . . testimony, and this is true whether there is a contradiction between different witnesses or in the testimony of a single witness").[20]

Additionally, the habeas court found that Dolan reasonably was concerned about offering the alibi testimony because none of these witnesses were able to provide an alibi for the petitioner before the fire, and it was not disputed that the petitioner's house was in close proximity to, and easily accessible by the petitioner from, the site of the arson. In particular, Dolan

testified that cross-examination might potentially have exposed the possibility that the petitioner "[c]ould . . . have woken up and went out the back door and returned . . . ." Although the alibi witnesses testified that only the first floor apartment at 15 Clover Place was accessible by the back door and that there was no way short of going outside to get between the two apartments, there was trial testimony from multiple witnesses that the petitioner lived across the street from the site of the arson. Further, Hunter's testimony confirmed that the petitioner was in the vicinity of the fire shortly after it had begun when she saw him outside of 11 Clover Place moving a car before the fire department arrived. Each of the proposed alibi witnesses' testimony would have corroborated the evidence offered by Hunter as to the petitioner's proximity to the fire close to the time that it began. None of the proffered alibi testimony, even if believed, established that the petitioner was in bed in 11 Clover Place either sufficiently prior to, or at the precise moment when, the fire was started. Compare *Vazquez* v. *Commissioner of Correction*, supra, 107 Conn. App. 185 (Vazquez' girlfriend testified that he was in bed with her at time of crime). Thus, we conclude that Dolan's decision not to call the family members as alibi witnesses, when placed in the context of the other evidence available to the jury, was not unreasonable. For this reason, we are not persuaded that *Bryant*, *Vazquez*, or *Siano* requires a different result on the facts of this case.

Our courts have upheld an attorney's choice to use cross-examination of another witness instead of calling a witness where cross-examination was sufficient to draw out the facts to which the uncalled witnesses would have testified; see *Coward* v. *Commissioner of Correction*, supra, 143 Conn. App. 801; *Stephen S.* v. *Commissioner of Correction*, supra, 134 Conn. App. 818–20; or where there was a valid reason, independent from whatever beneficial testimony they could offer, for failing to call those witnesses. See, e.g., *Michael T.* v. *Commissioner of Correction*, supra, 319 Conn. 635–38; *Chace* v. *Bronson*, 19 Conn. App. 674, 681, 564 A.2d 303, cert. denied, 213 Conn. 801, 567 A.2d 832 (1989); see also *Gaines* v. *Commissioner of Correction*, supra, 306 Conn. 681–82. In this case, none of the alibi witnesses knew for certain that the petitioner either was at home or not at the location that Hutchings' testimony placed him prior to the start of the fire. Also, in addition to Hutchings' placement of the petitioner outside of his house walking on Clover Place prior to the fire, Hunter testified at trial that she had seen the petitioner that morning, outside of 11 Clover Place and moving the car shortly after the fire began and before the fire department arrived.[21] Thus, as the habeas court noted, "the jury heard testimony from a nonfamily member about the petitioner's location shortly after the fire began."

In reviewing counsel's performance, we are required to be "highly deferential" to counsel's strategies and to "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." (Internal quotation marks omitted.) *Mukhtaar* v. *Commissioner of Correction*, supra, 158 Conn. App. 449. After reviewing the habeas court's factual findings, the record itself, and the law which we must follow, we are unable to find that the court erred in concluding that Dolan's conduct in failing to call the proposed alibi witnesses in support of the petitioner's alibi defense did not constitute deficient performance.[22]

B

We recognize that to prevail on a claim of ineffective assistance of counsel pursuant to *Strickland*, a petitioner must show both that counsel's performance was deficient and that such deficient performance prejudiced his defense; thus, a failure to prove either deficient performance or prejudice is fatal to his or her claim. *Bryant* v. *Commissioner of Correction*, supra, 290 Conn. 510. Although we have determined that the habeas court did not err in finding that the petitioner did not prove deficient performance, and thus that his claim cannot succeed, we also find that even if counsel's performance in not calling the four alibi witnesses was deficient, the habeas court did not err in finding that his performance did not satisfy the prejudice prong of *Strickland*. See *Strickland* v. *Washington*, supra, 466 U.S. 691–96.

Our analysis of the prejudice prong requires us to determine the probable effect that counsel's alleged defective performance had under the circumstances of the case before the court. Thus, "[t]o satisfy [this] prong, a claimant must demonstrate that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." (Internal quotation marks omitted.) *Bryant* v. *Commissioner of Correction*, supra, 290 Conn. 510. "In assessing prejudice under *Strickland*, the question is not whether a court can be certain counsel's performance had no effect on the outcome or whether it is possible a reasonable doubt might have been established if counsel acted differently. . . . Instead, *Strickland* asks whether it is reasonably likely the result would have been different. . . . This does not require a showing that counsel's actions more likely than not altered the outcome, but the difference between *Strickland*'s prejudice standard and a more-probable-than-not standard is slight and matters only in the rarest case. . . . The likelihood of a different result must be substantial, not just conceivable." (Internal quotation marks omitted.) *Anderson* v. *Commissioner of Correction*, 313 Conn. 360, 376, 98 A.3d 23 (2014), cert. denied sub nom. *Anderson* v. *Semple*,     U.S.    , 135 S. Ct. 1453, 191 L. Ed. 2d 403 (2015).

"In making this determination, a court hearing an ineffectiveness claim must consider the totality of the evidence before the . . . jury. Some of the factual findings will have been unaffected by the errors, and factual findings that were affected will have been affected in different ways. Some errors will have had a pervasive effect on the inferences to be drawn from the evidence, altering the entire evidentiary picture, and some will have had an isolated, trivial effect. Moreover, a verdict or conclusion only weakly supported by the record is more likely to have been affected by errors than one with overwhelming record support. Taking the unaffected findings as a given, and taking due account of the effect of the errors on the remaining findings, a court making the prejudice inquiry must ask if the defendant has met the burden of showing that the decision reached would reasonably likely have been different absent the errors." *Strickland* v. *Washington*, supra, 466 U.S. 695–96. "[I]n assessing whether there is a substantial likelihood that the addition of such evidence would have resulted in a different outcome, we must consider the cumulative effect of all of the evidence. See *Wong* v. *Belmontes*, 558 U.S. 15, 26, 130 S. Ct. 383, 175 L. Ed. 2d 328 (2009) ('reviewing court must consider all the evidence—the good and the bad—when evaluating prejudice')." (Emphasis omitted.) *Anderson* v. *Commissioner of Correction*, supra, 313 Conn. 377.

"[T]he ultimate focus of inquiry must be on the fundamental fairness of the proceeding whose result is being challenged. . . . The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." (Internal quotation marks omitted.) *Sanchez* v. *Commissioner of Correction*, 314 Conn. 585, 606–607, 103 A.3d 954 (2014).

In the present case, the petitioner argues that the habeas court erred in determining that Dolan's failure to call the alibi witnesses did not result in prejudice. In particular, he takes issue with the habeas court's and Dolan's characterization that the alibi offered by the witnesses would not be a complete alibi. The commissioner counters that the petitioner has not demonstrated prejudice, pointing to the habeas court's determinations that none of the testimony accounted for the petitioner's location at the exact time the fire began, which did not exclude the potentiality that the petitioner could have participated in the setting of the fire and then run back across the street to his apartment without being seen, and that the testimony of the potential alibi witnesses concerning what they saw after the explosion had occurred and the fire had begun was inconsistent in a number of places. Consequently, the commissioner contends, "[t]he habeas court correctly concluded that this incomplete and inconsistent testi-

mony 'would [not] have been helpful in establishing an alibi defense sufficient to raise reasonable doubt in the jur[ors'] minds' and did not '[undermine] . . . the outcome of the criminal jury trial' . . . ." We agree with the commissioner that the petitioner has failed to demonstrate the requisite prejudice.

With respect to a failure to call alibi witnesses, we have refused to find prejudice when the alibi defense is contrary to considerable evidence in the record as to the petitioner's location at the relevant time. See *Rodriguez* v. *Commissioner of Correction*, 151 Conn. App. 232, 238–40, 94 A.3d 722 (no prejudice demonstrated for failure to investigate alibi defense where petitioner did not call any of proposed witnesses, and alibi was contradicted in several material ways by both evidence at trial and information received separately by defense counsel), cert. denied, 314 Conn. 910, 100 A.3d 849 (2014).[23]

In cases where prejudice has been demonstrated, the courts have focused on both the breadth and the depth of the impact that the unoffered testimony would have had on the trial. For instance, in *Bryant* v. *Commissioner of Correction*, supra, 290 Conn. 523,[24] our Supreme Court noted that the four witnesses offered a compelling alternative to the testimony offered at trial. Appraising this evidence against Bryant, the Supreme Court noted the failure to call the alternate witnesses allowed the two primary witnesses against Bryant, who were of "dubious credibility"; id., 525; to connect Bryant with the testimony of the state's medical examiner and left the medical examiner's testimony uncontested.[25] Id., 523–26. Thus, had counsel presented this plausible alternative supported by neutral, third party witnesses, it would have called into account "the most basic elements of the state's case in a trial that was largely a credibility contest." See *Gaines* v. *Commissioner of Correction*, supra, 306 Conn. 692, discussing *Bryant* v. *Commissioner of Correction*, supra, 517–18.

Finally, two recent analyses of the prejudice prong in cases involving an attorney's failure to call nonalibi, nonexpert witnesses require our attention. First, our Supreme Court's decision in *Sanchez* v. *Commissioner of Correction*, supra, 314 Conn. 585, provides useful guidance in weighing the respective factors raised by its decision in *Bryant* and in subsequent cases. Following a trial in which both sides called a considerable number of witnesses, Jorge Sanchez was convicted of, inter alia, murder for his participation in a gang related shooting. Id., 588–98. Reviewing Sanchez' claim that his attorney had rendered constitutionally defective assistance by not calling two further witnesses, the court held that the strength of the state's case, the considerable and numerous problems with Sanchez' witnesses, and the intended effect of the proffered testimony—specifically, discrediting one of the three witnesses—had

already been primarily accomplished at trial and that this prevented him from demonstrating the necessary prejudice. Id., 607–13.

Addressing Sanchez' arguments that his case was similar to *Bryant* v. *Commissioner of Correction*, supra, 290 Conn. 502, and *Gaines* v. *Commissioner of Correction*, supra, 306 Conn. 664, our Supreme Court distinguished those cases on the following grounds: "First and foremost, in each of those cases, the habeas court expressly found that the proffered witnesses were compelling and credible. Additionally, those witnesses were neutral, uninvolved parties who either provided their accounts contemporaneously with the crime at issue, or gave a sound and credible reason for not having done so. Here, in stark contrast, the habeas court found [the two proffered witnesses] *not* credible, a finding that is amply supported by the evidence. . . . Finally, aside from issues of credibility, the substance and quality of the testimony offered by the two men differs significantly from that provided by the witnesses in *Bryant* and *Gaines*: unlike the testimony in those cases, the testimony of [witnesses here] was not particularly detailed, and it did not directly concern the ultimate issues in the case, such as whether the charged crime actually occurred, whether a third party instead of the petitioner committed the crime or whether the petitioner could not have committed the crime because he was elsewhere when it occurred." (Emphasis in original.) *Sanchez* v. *Commissioner of Correction*, supra, 314 Conn. 617.

Second, in *Ayala* v. *Commissioner of Correction*, 159 Conn. App. 608, 609–11, 123 A.3d 447, cert. denied, 319 Conn. 933, 125 A.3d 207 (2015), Victor Ayala had been convicted of various crimes related to his violent entry into the home owned by a married couple; this couple, who testified against Ayala at his underlying trial, had recanted their allegations against Ayala in signed statements prior to the commencement of trial, but then testified at trial that their original accounts were correct. At his habeas trial, Ayala presented two witnesses who could have testified at his criminal trial as to the nature and frequency of his habitation in the couple's residence. Id., 614–15. On appeal, this court upheld the habeas court's determination that the two witnesses would not have aided Ayala's defense sufficiently because: the married couple had known him, had called the police, had positively identified him, had testified against him at trial, and although subject to extensive cross-examination on their own drug use, criminal activity, and prior recantation, they were believed by the jury; there was evidence that Ayala had lied to the police and attempted to disguise his appearance at the time of arrest; and the habeas testimony of the witnesses and the trial testimony of the couple was mostly reconcilable. Id., 616–18. We also noted that the habeas court "did not explicitly find the testimony of [the two

proffered witnesses] credible." Id., 616.[26]

In the present case, we begin by noting that the habeas court, though not making explicit credibility determinations, stated that it could do so to the petitioner's detriment. Further, even assuming the credibility of the petitioner's alibi witnesses, the habeas court found them not to be helpful, as they provided no direct evidence of the petitioner's location prior to or when the fire began. As the habeas court was in the best position to make these determinations, we must accord them considerable weight. See *Sanchez* v. *Commissioner of Correction*, supra, 314 Conn. 617.

Further, the habeas court reasonably could have concluded on the basis of the record before it that the testimony of the alibi witnesses would have, at most, a minimal negative effect on the credibility of Hutchings' trial testimony for several reasons. First, many of Hutchings' credibility problems and issues already had been placed already before the jury, in that both Dolan and Hopkins highlighted the apparent bias and inconsistencies in Hutchings' testimony. Second, the petitioner was known by Hutchings. Third, the testimony of the proposed alibi witnesses did not contradict Hutchings' testimony that she had seen the petitioner and Newton carrying a large container into 16 Clover Place about one hour before the fire began, and that she had spoken to them at that time.[27]

Finally, although there was no physical evidence tying the petitioner to the arson and only one eyewitness, Hutchings, directly tied the petitioner to the arson, other evidence concerning the guilt of the petitioner, wholly unaffected by the proposed alibi testimony, was offered at both the criminal trial and the habeas trial. At the criminal trial, Hutchings testified that the petitioner had attempted to intimidate her a few days before she was to testify at his trial, and a police officer testified that the petitioner had used a false name when the officer attempted to arrest him.[28] "Evidence that an accused has taken some kind of evasive action to avoid detection for a crime, such as flight, concealment of evidence, or a false statement, is ordinarily the basis for a [jury] charge on the inference of consciousness of guilt." *State* v. *Oliveras*, 210 Conn. 751, 759, 557 A.2d 534 (1989). "[T]he state of mind that is characterized as guilty consciousness or consciousness of guilt is strong evidence that a defendant is indeed guilty." (Internal quotation marks omitted.) *State* v. *Robertson*, 254 Conn. 739, 761, 760 A.2d 82 (2000). Actions held to constitute consciousness of guilt evidence include efforts to intimidate witnesses; id.; and the use of a false name. See *State* v. *Ali*, 92 Conn. App. 427, 435–36, 886 A.2d 449 (2005), cert. denied, 277 Conn. 909, 894 A.2d 990 (2006). The proposed alibi witnesses offered no testimony during the habeas trial concerning the alleged threats to Hutchings or about the false name

incident.[29]

In summary, the petitioner is unable to demonstrate that the habeas court erred in concluding that he was not prejudiced by Dolan's failure to call his relatives as alibi witnesses. Consequently, as he has failed to demonstrate either deficient performance or prejudice, the petitioner's claim of ineffective assistance of counsel must fail.

## II

Next, the petitioner argues that the habeas court erred in sustaining the commissioner's objections that a number of police reports offered at the habeas trial (specifically, exhibits twenty-two through twenty-nine)[30] were irrelevant and, therefore, in subsequently granting the commissioner's motion to dismiss counts one and two of his petition. He argues that these reports supported the defense theory that Hutchings received leniency from the New Haven Police Department and could have been used to cross-examine her. In response, the commissioner urges us to affirm the habeas court's ruling that these police reports were irrelevant. In particular, he directs our attention to *Gibson* v. *Commissioner of Correction*, 135 Conn. App. 139, 41 A.3d 700, cert. denied, 305 Conn. 922, 47 A.3d 881 (2012), where we dismissed an appeal involving the same witness and similar claims. We agree with the commissioner.

Additional facts are necessary to our resolution of the petitioner's claim. At the habeas trial, Dolan was the first witness called to testify by the petitioner's first habeas attorney, Melissa Toddy. During her inquiry into his preparation and strategy for the trial, Dolan testified that he learned that Hutchings had been a confidential informant "on a number of . . . earlier occasions," though he did not recall getting any other police reports related to her involvement with the police. Seeking information concerning past payments that she had received from the police, he filed various discovery requests, including the disclosure and production of "[a]ny and all documents regarding . . . Hutchings' work as a police informant," and sought to subpoena a police officer whom he believed was her contact at the police department. At no point did he receive any documents related to her activities as a confidential informant or information concerning her involvement in either past crimes or complaints that were later uncorroborated.

Toddy then showed Dolan exhibits twenty-two through twenty-nine and asked whether he had seen the reports at issue; he testified that he had not. Following the initial objection by the commissioner, Toddy explained that each of these police reports predated the petitioner's arrest, involved situations where Hutchings either had been arrested for certain incidents or had reported crimes against third parties that were uncor-

roborated, and, in all of the cases, there were no records of a conviction. Her ultimate theory was that, if Dolan had this information, "he could have inquired in such a way to show the jury in support of his defense theory that the witness perhaps received consideration from the police in that she wasn't prosecuted sometimes."[31] On this ground, she argued, the admission of the reports was required for the court to determine whether the information that they contained was material and, therefore, either should have been provided or should have been discovered and used by Dolan to prepare his defense.

Articulating further the grounds for his objections, the commissioner noted that these reports were irrelevant because they had nothing to do with the petitioner and involved unrelated incidents of police conduct. Explaining why the threshold issue of relevancy had not been demonstrated, he noted that one cannot inquire about past arrests that do not result in a conviction and, thus, having this extrinsic information would be irrelevant because it could not be used. Arguing that the contents of the reports constituted hearsay and that parties cannot use extrinsic evidence to impeach, the commissioner contended that, regardless of whether Dolan could or could not have discovered the reports on his own, "if he can't ask the questions based on the reports . . . there can be no relevance to this case . . . ." After hearing the parties' arguments and expressing concerns about the relevancy of the documents, the court sustained the commissioner's objection.

We begin by noting that, although the petitioner argues that dismissal of counts one and two for lack of a prima facie case was in error, his entire position is based on the habeas court's ruling that the reports were inadmissible because they were irrelevant. Therefore, we limit our review to the relevancy determination.[32]

"All relevant evidence is admissible, except as otherwise provided by the constitution of the United States, the constitution of this state, the [Connecticut] Code [of Evidence] or the General Statutes. Evidence that is not relevant is inadmissible. . . . Evidence is relevant if it has any tendency to make the existence of any fact that is material to the determination of the proceeding more probable or less probable than it would be without the evidence. . . . Relevant evidence is evidence that has a logical tendency to aid the trier in the determination of an issue. . . . One fact is relevant to another if in the common course of events the existence of one, alone or with other facts, renders the existence of the other either more certain or more probable. . . .

"Evidence is irrelevant or too remote if there is such a want of open and visible connection between the evidentiary and principal facts that, all things consid-

ered, the former is not worthy or safe to be admitted in the proof of the latter. . . . Evidence is not rendered inadmissible because it is not conclusive. All that is required is that the evidence tend to support a relevant fact even to a slight degree, so long as it is not prejudicial or merely cumulative. . . . Furthermore, [t]he fact that the [trier of fact] would have . . . to rely on inferences to make [a] determination does not preclude the admission of . . . evidence. . . . The trial court [however] properly could [exclude] evidence where the connection between the inference and the fact sought to be established was so tenuous as to require the [trier of fact] to engage in sheer speculation." (Citation omitted; internal quotation marks omitted.) *Masse* v. *Perez*, 139 Conn. App. 794, 805–806, 58 A.3d 273 (2012), cert. denied, 308 Conn. 905, 61 A.3d 1098 (2013).

"No precise and universal test of relevancy is furnished by the law, and the question must be determined in each case according to reason and judicial experience. . . . The trial judge must consider many factors in ruling on relevancy. . . . In arriving at its conclusion, the trial court is in the best position to view the evidence in the context of the entire case, and we will not intervene unless there is a clear abuse of the court's discretion. On appeal, we are limited in our review to a determination of whether, under the circumstances of the case, in exercising its broad discretion, the trial court could legally act as it did, and not whether we, under the same circumstances, would make the same ruling." (Internal quotation marks omitted.) *State* v. *Lewis*, 146 Conn. App. 589, 602–603, 79 A.3d 102 (2013), cert. denied, 311 Conn. 904, 83 A.3d 605 (2014).

The petitioner claims that these reports were relevant to his claim that there was a *Brady* violation[33] or, in the alternative, a separate ineffective assistance of counsel claim pursuant to *Strickland*.[34] "In *Brady*, the United States Supreme Court held that the suppression by the prosecution of evidence favorable to an accused upon request violates due process [when] the evidence is material either [as] to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." (Internal quotation marks omitted.) *Lapointe* v. *Commissioner of Correction*, 316 Conn. 225, 262, 112 A.3d 1 (2015). To prevail on a *Brady* claim, a party must demonstrate each of the three following elements: "The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the [s]tate, either [wilfully] or inadvertently; and prejudice must have ensued. . . . Under the last *Brady* prong, the prejudice that the defendant suffered as a result of the impropriety must have been material to the case . . . . [T]he evidence will be deemed material only if there would be a reasonable probability of a different result if the evidence had been disclosed. . . . This standard is met if the favorable evidence could

reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." (Citations omitted; internal quotation marks omitted.) Id., 262–63.

"[T]he *Brady* rule applies not just to exculpatory evidence, but also to impeachment evidence . . . which, broadly defined, is evidence having the potential to alter the jury's assessment of the credibility of a significant prosecution witness." (Citations omitted; internal quotation marks omitted.) *Adams* v. *Commissioner of Correction*, 309 Conn. 359, 369–70, 71 A.3d 512 (2013). Thus, our case law has recognized that explicit agreements or understandings between a witness and the prosecutor or the police must be disclosed; see, e.g., id., 370; but "[a]n unexpressed intention by the state not to prosecute a witness does not." (Internal quotation marks omitted.) *Elsey* v. *Commissioner of Correction*, 126 Conn. App. 144, 152, 10 A.3d 578, cert. denied, 300 Conn. 922, 14 A.3d 1007 (2011).

Pursuant to § 6-6 (b) of the Connecticut Code of Evidence, "[a] witness may be asked, in good faith, about specific instances of conduct of the witness, if probative of the witness' character for untruthfulness," but extrinsic evidence of the specific instances cannot be offered. Consequently, "[a] witness may not be impeached for a prosecution that was nolle prosequi, or a mere arrest, because there is no conviction . . . but a witness may be asked if he or she committed the act, provided the act was indicative of lack of veracity." (Citation omitted; emphasis omitted.) C. Tait & E. Prescott, Connecticut Evidence (5th Ed. 2014) § 6.32.3, p. 398.

The petitioner divides these reports into two categories: reports where leniency allegedly was demonstrated because Hutchings was arrested, but either no charges were filed or they were nolled (exhibits twenty-two, twenty-seven, twenty-eight, and twenty-nine);[35] and reports where Hutchings accused another party of misdeeds and the other party apparently was not prosecuted (exhibits twenty-three, twenty-four, twenty-five, and twenty-six).[36] These reports, which range from early 1993 to late 1995, involve alleged crimes wholly separate from those about which she testified in the petitioner's criminal trial and, with the exception of Hutchings herself, do not involve any other witness or party from the petitioner's criminal trial.

Although portions of the submitted reports are redacted, we note that, apart from these reports, no other evidence showing any explicit understanding or agreement with Hutchings on the part of the police or the prosecutor was offered. Further, for most, though not all, of the reports, there was also no evidence concerning any actions subsequent to the incidents in the reports that could explain the reasons why no charges were brought against Hutchings or against those people accused by her. Therefore, whatever Hutchings' subjec-

tive beliefs about the nature of her relationship might have been,[37] the connection between these reports and a demonstration that she received consideration from the police is extremely tenuous. Additionally, while recognizing the discretion of a police officer generally to determine whether to take action, to warn instead of to arrest if taking action, and to determine initial charges, we note that it is prosecutors, not the police, who wield the discretion ultimately to determine whether, when, and what charges to pursue. See *State* v. *Kinchen*, 243 Conn. 690, 699, 707 A.2d 1255 (1998); *Massameno* v. *Statewide Grievance Committee*, 234 Conn. 539, 575, 663 A.2d 317 (1995). Finally, as in *Gibson* v. *Commissioner of Correction*, supra, 135 Conn. App. 144–47, the reports were not offered to show that Hutchings was acting as a confidential informant rather than an eyewitness in this case, and there already was substantial evidence before the jury of her past activity as a confidential informant.

Thus, here, as in *Gibson* v. *Commissioner of Correction*, supra, 135 Conn. App. 147–48, the petitioner did not demonstrate to the habeas court that the evidence had probative value in any challenge of Hutchings on cross-examination. On this record, we do not conclude that the excluded evidence likely would have produced information that was relevant to the claims before the court. Accordingly, we conclude that the court properly sustained the commissioner's objection. Further, a failure to find the reports relevant to the materiality prong of the petitioner's *Brady* claim in count one of his amended petition necessarily renders those reports irrelevant to demonstrating prejudice as to his *Strickland* claim in count two. See *Lapointe* v. *Commissioner of Correction*, supra, 316 Conn. 266–67 ("the test for materiality under *Brady* and the test for prejudice under *Strickland* are the same"). Therefore, as the petitioner's arguments that the habeas court erred by dismissing counts one and two were premised entirely on the court's determination that the police reports were irrelevant, we cannot conclude that the habeas court's action was improper.

The judgment is affirmed.

In this opinion the other judges concurred.

[1] This court also stated that the jury reasonably could have found that Hunter had "see[n] the [petitioner and Newton] together that morning . . . ." *State* v. *Spearman*, 58 Conn. App. 467, 469, 754 A.2d 802 (2000). After thoroughly reviewing Hunter's trial testimony, however, we are unable to find any statement from which the jury reasonably could have made such a finding, and are unable to ascertain from where this conclusion stemmed. Reviewing both the closing arguments of the prosecutor in the petitioner's original trial and the state's brief during the petitioner's direct appeal; *State* v. *Spearman*, Conn. Appellate Court Records & Briefs, February Term, 2000, State's Brief pp. 2–3, 11–12; the state at neither point attributed this particular fact to Hunter. Therefore, finding no support for this statement in the record, we agree with the petitioner that our previous statement is unsupported, and we do not attribute it any weight in appraising the petitioner's claims in this appeal.

[2] The petitioner filed his initial application for a writ of habeas corpus

in 2007, while in custody for the conviction whose legality he presently challenges, but has since been released from incarceration. We may reach the merits of the petitioner's claims, however, "because he was in custody at the time he filed the habeas petition and there are collateral consequences attendant to his conviction." *Carpenter* v. *Commissioner of Correction*, 290 Conn. 107, 116 n.6, 961 A.2d 403 (2009); see also *Hastings* v. *Commissioner of Correction*, 82 Conn. App. 600, 603, 847 A.2d 1009 (2004) (discussing jurisdictional nature of custody requirement in General Statutes § 52-466), appeal dismissed, 274 Conn. 555, 876 A.2d 1196 (2005).

[3] We, like the habeas court, adopt the spelling agreed to by the parties of this witness' name.

[4] See *Strickland* v. *Washington*, 466 U.S. 668, 687, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984).

[5] The admonition in *Strickland* to avoid reliance on hindsight cuts both ways, however, as we also cannot rely on hindsight to *justify* the choices made by an attorney. See, e.g., *Kimmelman* v. *Morrison*, 477 U.S. 365, 386–87, 106 S. Ct. 2574, 91 L. Ed. 2d 305 (1986); see also *Gabaree* v. *Steele*, 792 F.3d 991, 999 (8th Cir. 2015), cert. denied sub nom. *Griffith* v. *Gabaree*, U.S.     (84 U.S.L.W. 3358, February 29, 2016); *Caldwell* v. *Lewis*, 414 Fed. Appx. 809, 816 (6th Cir. 2011); *Madrigal* v. *Yates*, 662 F. Supp. 2d 1162, 1179 (C.D. Cal. 2009). Thus, as articulated by the United States Supreme Court, "courts may [neither] indulge post hoc rationalization for counsel's decisionmaking that contradicts the available evidence of counsel's actions . . . [nor] may they insist counsel confirm every aspect of the strategic basis for his or her actions." (Citation omitted; internal quotation marks omitted.) *Harrington* v. *Richter*, 562 U.S. 86, 109, 131 S. Ct. 770, 178 L. Ed. 2d 624 (2011).

[6] The habeas court in *Vazquez* admitted that the alibi would have to be established by Vazquez and his girlfriend, and that both of their interests in the matter would be subjected to cross-examination, but noted that no other evidence had been submitted that would suggest that either witness would be impeachable in any other way. *Vazquez* v. *Commissioner of Correction*, Superior Court, judicial district of Tolland, Docket No. CV-04-0004441, 2006 WL 3878079, *6 (December 15, 2006), aff'd, 107 Conn. App. 181, 944 A.2d 429 (2008).

[7] Vazquez' defense counsel had passed away and, therefore, was unavailable to testify at the habeas trial. *Vazquez* v. *Commissioner of Correction*, supra, 107 Conn. App. 185 n.3.

[8] Although the investigator's report was not entered into evidence during the habeas trial, Dolan testified about its contents with respect to the general substance of the alibi that the witnesses would offer.

[9] The habeas court stated: "Attorney Lawrence Hopkins, who represented codefendant Terrance Newton, argued a motion for a new trial shortly before Newton and the petitioner were sentenced. The transcript indicates that exhibit A to the motion for a new trial was a statement by a Priscilla Lassy, who indicated in that statement that Ms. Hutchings had told her that her trial testimony was fabricated and motivated by potentially collecting the twenty-five thousand dollar ($25,000.00) reward offered to resolve the arson case. . . . The motion for a new trial was denied and the matter proceeded to sentencing. The petitioner was no longer represented by Attorney Dolan at sentencing but instead by Attorney Norman Pattis, who also was petitioner's appellate counsel." (Citation omitted.)

[10] The habeas court stated: "The notice identifies Jashon Spearman, Ydalesse Spearman, Edith Hunter, Jay Hunter and Shane Hawkins as alibi witnesses. All five are also disclosed on the petitioner's witness list. . . . The witness list also lists Josh Spearman, Carl Babb, MaryEllen Gunn, Stacey Spearman, Daniel Blackmon and Detective Joseph Green."

[11] Dolan could not state, however, what role the testimony of two witnesses proffered to rehabilitate Hutchings' testimony played in making this determination.

[12] The habeas court summarized Dolan's testimony about his strategic decision not to call the family members as witnesses: "Attorney Dolan provided the following rationale: '[It was] my fear . . . that the jurors would potentially compare the two—the two versions and see that maybe [the petitioner's] family had a greater motive to protect him and that—and Katherine—and compare that [version to] Katherine Hutchings' motive for a couple hundred dollars and say, well, the Spearmans have a greater motive and maybe water down the proof beyond a reasonable doubt standard and not hold the state to that—to that high standard, so I was—I made—you know, made the decision that it was—that we had done enough on cross-examina-

tion and didn't want to take that risk of—to having the jury water down the standard of proof beyond a reasonable doubt. And that was only made after—after the state rested.' . . . Attorney Dolan reiterated these concerns and his decision-making process on cross-examination." (Citation omitted.)

[13] The habeas court stated: "The petitioner testified it was his grandmother's car. Other witnesses testified the car belonged to Stacey Spearman."

[14] The habeas court stated: " 'Probably pajama pants or sweatpants or something. I don't remember—gym shorts or something.' . . ."

[15] The habeas court stated: "Edith Hunter, who lived across the street from the Spearman residence in a building adjacent to the one that burned down, testified before the jury that she saw the petitioner for the first time the morning of the fire when he came out of the house to move the car. . . . Thus, the jury heard testimony from a nonfamily member about the petitioner's location shortly after the fire began."

[16] Hunter also testified that the petitioner was nicknamed "Little Man."

[17] Proceeding first, Hopkins inquired into, inter alia: Hutchings' past actions as an informant for the police; the potential conflict in her testimony that the petitioner had been outside her house a few days before she began testifying; potential inconsistencies between her statement to the police and her testimony about when she went to the store and to which store she went; whether her knowledge of the petitioner and Newton came from having seen them in the neighborhood; and statements she had made to the firefighters and parties investigating the fire. Dolan then probed various aspects of her testimony, including: whether another store might have been closer and more convenient given that she only had one hour to get certain items for her children's field trip; an examination of the route she claimed to have taken that morning; her recollection of what she had seen on Clover Place after the fire; her testimony regarding the petitioner's allegedly having come by her house and acting in a threatening manner; and her relationship with the police and her statement to the police on the arson.

[18] Baab worked at the Truman School and was there the morning of the fire. He testified that a man ran up to the door, briefly interacted with him, and then ran off toward Ella T. Grasso Boulevard. Baab testified that he previously had had the petitioner as a student, that he had seen the petitioner periodically since that time, and that he had not recognized the gentleman at the door.

Though Baab did not testify as to the petitioner's location at the time of the fire, his testimony, if credited by the jury, greatly reduced the possibility that it was the petitioner who ran up to the door of the school. A prior witness called by the state, Johnnie Robinson, had testified that he lived on Truman Street. Robinson testified that, immediately prior to seeing smoke on the morning of the fire, he observed a man run up to the doors of the school, turn around, and head in the direction of Ella T. Grasso Boulevard. Robinson affirmed that he had seen this man acting suspiciously earlier that morning, that this man was approximately the same height as Robinson, which was six feet tall, and that the man was dressed in what might have been pajamas. Baab similarly testified that he estimated that the unidentified man at the door was approximately five feet, ten inches tall, but also noted that the petitioner was only roughly five feet, five inches in height.

[19] Admittedly, it is unclear when Hawkins headed back downstairs, specifically, whether it was before, simultaneously with, or after the petitioner had headed downstairs after looking for his keys.

[20] We recognize that "[i]mplied bias may be shown by the relationship of a witness to a party . . . ." *State* v. *Asherman*, 193 Conn. 695, 719–20, 478 A.2d 227 (1984), cert. denied, 470 U.S. 1050, 105 S. Ct. 1749, 84 L. Ed. 2d 814 (1985). Our model jury instructions for criminal jury trials also recognize, however, that bias is only one of many factors that a trier of fact may rely upon in making a credibility determination. See Connecticut Criminal Jury Instructions (4th Ed. 2008) § 2.4-2 (Rev. to November 1, 2008 [modified May 10, 2012], available at http://jud.ct.gov/ji/criminal/part2/2.4-2.htm (last visited April 4, 2016). As with other issues relevant to a witness' motive in, or reason for, testifying, any potential bias of a relative must be considered by the trier of fact in light of all of the relevant circumstances. Cf. *Brethauer* v. *Schorer*, 81 Conn. 143, 144, 70 A. 592 (1908) ("[t]he testimony of each [witness] is to be weighed for what it seems to the trier to be worth, in view of its character, the demeanor of the witness, and the probability or improbability that what he says is true"); Connecticut Criminal Jury Instructions, supra, § 2.4-2 (lodestar of jury's credibility determination is "quality of the evidence" presented). Thus, an attorney's failure to call a family member to testify can amount to ineffective assistance of counsel. See,

e.g., *Lopez* v. *Miller*, supra, 915 F. Supp. 2d 428–29, and cases cited therein.

[21] Over the course of her testimony, Hunter gave slightly different accounts for when and where she saw the petitioner for the first time on the morning of the fire. During Dolan's cross-examination, she stated that she saw the petitioner for the first time "[w]hen he came out the door, out of the house," and that she saw him move a car; she did not recall, however, whether he returned to his residence afterward. During subsequent cross-examination by Hopkins, she stated that she did not actually see the petitioner coming out of the apartment, but, rather, that she saw him only once he was outside his residence. During further questioning by Dolan, she clarified that she saw the petitioner "in front of [the] door" to 11 Clover Place. Finally, she agreed with the state that, under any circumstance, she could not swear under oath "that [the petitioner] was inside his house at the time the explosion occurred . . . ." It is clear from Dolan's testimony at the habeas trial that he also was aware that none of the family members he considered as alibi witnesses could swear under oath that the petitioner was inside his house at the time the explosion occurred.

[22] Because we find that the record is sufficient to uphold the habeas court's determination that Dolan had a reasonable basis not to call the alibi witnesses, we are not required specifically to examine whether and to what degree defense counsel can reasonably consider the cross-examination skills of the prosecutor in determining whether to call a witness. We note, however, that the petitioner does not assert that the habeas court's finding that Dolan considered the skills of the prosecutor in this case was clearly erroneous; he primarily focuses upon other factual and legal aspects of the habeas court's decision in arguing that Dolan's performance was deficient.

[23] In other circumstances, we also have not found prejudice when the alibi defense was contradicted in material respects by the petitioner's account or undercut by his or her actions; see *Brown* v. *Commissioner of Correction*, 161 Conn. App. 770, 782–84, 129 A.3d 172 (2015) (although recognizing weaknesses in accounts and credibility of state's three eyewitnesses at trial, no prejudice where petitioner's statements to attorney as to his location at time of murder contradicted alibi witness' account and testimony by coconspirator that petitioner had instructed him to "to say that [the petitioner] wasn't there the night of the shooting" created credibility issues for alibi witness [internal quotation marks omitted]), cert. denied, 320 Conn. 916, A.3d (2016); see also *Rodriguez* v. *Commissioner of Correction*, supra, 151 Conn. App. 238–40; or where the alibi testimony, even if credible, would leave sufficient time for the petitioner to have committed much or all of the crime as alleged. See *James G.* v. *Commissioner of Correction*, 120 Conn. App. 829, 834–35, 993 A.2d 474 (no showing of prejudice because "crimes took place over an extended period of time and on multiple occasions" such that "[a]ny effective alibi defense would have had to have persuaded the jury that the petitioner was absent from the victim's home for effectively the entire period during which the crimes were alleged to have happened"), cert. denied, 297 Conn. 922, 998 A.2d 168 (2010).

[24] We discussed this case in greater depth in part I A of this opinion.

[25] As noted by our Supreme Court, the state medical examiner's testimony could not conclusively establish Bryant as the cause of the decedent's death by blunt force trauma absent the testimony of these two eyewitnesses. *Bryant* v. *Commissioner of Correction*, supra, 290 Conn. 516–17. Additionally, two of the four proffered witnesses "were . . . trained emergency medical technicians"; thus, "[o]n the basis of their testimony, a jury reasonably could have concluded that [the victim] had sustained a gunshot wound to the left temple area of the head, and that the autopsy performed by the state's medical examiner [which did not find a gunshot wound] . . . was potentially incomplete or inaccurate." Id., 516–17; id., 525–26.

[26] Elsewhere, however, this court has accorded the habeas court's failure to make an explicit credibility determination less weight. See *Dieudonne* v. *Commissioner of Correction*, 141 Conn. App. 151, 161 n.5, 60 A.3d 385 (2013), appeal dismissed, 316 Conn. 474, 112 A.3d 157 (2015).

[27] This is not to say that alibi witnesses' testimony concerning an accused party's presence immediately following a crime cannot be used to support an alibi in all cases or that circumstantial evidence cannot be used to explain or bolster his or her alibi. See, e.g., *State* v. *Copas*, 252 Conn. 318, 339–40, 746 A.2d 761 (2000) ("[P]roof of a material fact by inference from circumstantial evidence need not be so conclusive as to exclude every other hypothesis. It is sufficient if the evidence produces in the mind of the trier a reasonable belief in the probability of the existence of the material fact." [Internal quotation marks omitted.]). Such issues, however, concern an issue of the

weight that a fact finder should give the testimony, which is within the sole province of the habeas court. See *Gaines* v. *Commissioner of Correction*, supra, 306 Conn. 677. Further, although it is conceivable that the alibi witnesses' testimony concerning the petitioner's *postexplosion* whereabouts might have impacted either the viability of Hutchings' *preexplosion* identification of the petitioner or her credibility more generally, such a mere possibility is insufficient to demonstrate prejudice. See *Anderson* v. *Commissioner of Correction*, supra, 313 Conn. 376 ("[t]he likelihood of a different result must be substantial, *not just conceivable*" [emphasis added; internal quotation marks omitted]). In this case, however, the petitioner did not produce a witness for the habeas court who saw him in the home immediately prior to, or at the time of, the beginning of the fire and explosion.

[28] The petitioner, who did not testify in the criminal trial, as was his right, testified in the habeas trial that he had an outstanding warrant for having left a halfway house when the officer arrested him. Although this fact might have explained to the jury his having given a false name to the arresting officer, it was not offered as evidence at the criminal trial. In the habeas trial, moreover, the petitioner neither offered any evidence rebutting Hutchings' allegations that he attempted to intimidate her shortly before she was called to testify at his criminal trial, nor did he allege in his habeas petition that Dolan provided ineffective assistance of counsel for failing to call him as a witness in the criminal trial.

[29] Further, testimony concerning a possible motive that the petitioner might have had for setting the fire was offered during both his criminal and habeas trials. At the criminal trial, Hunter and Dellamura testified that the previous tenant of the second floor of 16 Clover Place had moved out, but had left personal effects such as furniture in the apartment. During the habeas trial, the petitioner testified that he had had a physical relationship with Loquita Joiner, a woman who had previously lived at 16 Clover Place; Joiner had had problems in the past with her roommate; and he knew that, although the roommate no longer lived there at the time of the fire, she returned to pick up mail. None of the proposed alibi witnesses offered testimony at the habeas trial concerning the petitioner's relationship with either Joiner or her roommate.

[30] Although the relevant headings and certain portions of the text of the petitioner's brief suggest that this claim includes exhibit twenty-one, the majority of the substantive portions of his brief address only those exhibits we list. We further note that exhibit twenty-one, which consists of a request for disclosure made during the underlying criminal trial, in fact, was admitted without objection as a full exhibit.

Additionally, following representations by the commissioner that the allegations in two of the reports were related to an attempted sexual assault against Hutchings and at least one of these incidents resulted in a conviction, the habeas court ordered that exhibits twenty-three and twenty-four be sealed, the sealed exhibits would be retained as a court exhibit for the purposes of appeal, and redacted copies of these two exhibits would be submitted. Subsequently, redacted copies of these exhibits were filed and marked exhibits forty-one and forty-two for identification. We note that the petitioner does not base his appeal on these aspects of the habeas court's decision, and we refer to these two reports as exhibits twenty-three and twenty-four for the purpose of clarity.

[31] Toddy also admitted, however, that due to redacted information it was unclear in several of these reports what had transpired.

[32] Although a subsequent habeas attorney for the petitioner raised other objections during the habeas court's consideration of the motion to dismiss at trial, the petitioner has not pursued these objections on appeal. We, therefore, consider them abandoned. See *Keating* v. *Ferrandino*, 125 Conn. App. 601, 603–604, 10 A.3d 59 (2010).

[33] See *Brady* v. *Maryland*, 373 U.S. 83, 87, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963).

[34] The petitioner premises these theories on the argument that if Dolan could have discovered this evidence, its importance to the cross-examination of Hutchings would support his claim of ineffective assistance of counsel, but, if the materials were suppressed, that would support his claim of a *Brady* violation.

[35] The allegations in these reports involved: criminal mischief where Hutchings allegedly threw a brick through the window of her boyfriend's car, and snatched his phone and a jar of pennies, but does not appear to have been arrested; her apparent arrest following an attempted motor vehicle theft and a subsequent charge of criminal mischief for kicking the cage in a police

cruiser; stolen and forged checks were returned with the name "Cathy or (Cathryn) Hutchings"; and a breach of the peace where Hutchings and another woman were arrested for a breach of the peace after fighting in the street.

[36] The three reports to which the petitioner explicitly points involved allegations of an attempted sexual assault against Hutchings, an attempt to bribe her to drop these sexual assault charges, and a breach of the peace. Additionally, the police report marked exhibit twenty-five for identification involved allegations of a simple assault against Hutchings by one or more people.

[37] We note that in one report, the officer reported that Hutchings allegedly told him that "she couldn't be arrested for her conduct because she is a drug informant for the narcotics unit."